## GILMAN v. PHILADELPHIA.

The power to regulate commerce comprehends the control for that purpose, and to the extent necessary, of all the navigable waters of the United States which are accessible from a State other than those on which they lie; and includes, necessarily, the power to keep them open and free from any obstruction to their navigation, interposed by the States or otherwise. And it is for Congress to determine when its full power shall be brought into activity, and as to the regulations and sanctions which shall be provided.

This power, however, covering as it does a wide field, and embracing a great variety of subjects, some of the subjects will call for uniform rules and national legislation; while others can be best regulated by rules and provisions suggested by the varying circumstances of differing places, and limited in their operation to such places respectively. And to the extent required by these last cases, the power to regulate commerce may be exercised by the States.

To explain. Bridges, turnpikes, streets, and railroads, are means of commercial transportation as well as navigable waters, and the commerce which passes over a bridge may be much greater than that which will ever be transported on the water which it obstructs. Accordingly, in a question whether a bridge may be erected over one of its own tidal and navigable streams, it is for the municipal power to weigh and balance against each other the considerations which belong to the subject—the obstruction of navigation on the one hand, and the advantage to commerce on the other—and to decide which shall be preferred, and how far one shall be made subservient to the other. And if such erection be authorized in good faith, not covertly and for an unconstitutional purpose, the Federal courts are not bound to enjoin it.

However, Congress may interpose whenever it shall be deemed necessary, by either general or special laws. It may regulate all bridges over navigable waters, remove offending bridges, and punish those who shall thereafter erect them. Within the sphere of their authority, both the legislative and judicial power of the nation are supreme.

174

Annunciating these principles on the one hand and on the other, the court refused to enjoin, at the instance of a riparian owner, to whom the injury would be consequential only, a bridge about to be built, under the authority of the State of Pennsylvania, by the city of Philadelphia, over the river Schuylkill, a small river—tidal and navigable, however, and on which a great commerce in coal was carried on by barges— which river was wholly within the State of Pennsylvania, and ran through the corporate limits of the city authorized to erect the bridge; and on both sides of which citizens in great numbers lived, and on both sides of which municipal authority was exercised on one as much as on the other; the bridge being a matter of great public convenience every way, and another bridge, just like it, having been erected and in use for many years, over the same stream, about five hundred yards above.

THE Constitution gives to *Congress* power to "regulate commerce between the States;" and this case was one relating to the respective jurisdiction of a State and of the United States over tide and navigable waters. The case was thus:

The city of Philadelphia, as originally laid out by Mr. Penn, was situated *between* the Delaware and Schuylkill Rivers; the former a wide river, on the east of the city; the latter a small and narrow stream, on the west, which, making a curve below the city, falls into the far larger water, about six miles *below* the town.

This river Schuylkill is tidal from its mouth, seven and a half miles upwards—that is to say, completely *past* every part of the rear of the city—and though narrow, muddy, and shallow, is navigable for vessels drawing from eighteen to twenty feet of water. *It is wholly within the State of Pennsylvania.* No large vessels of any kind are seen upon it. Being one outlet of the coal regions of Pennsylvania, the principal, almost the sole commerce of the river is coal. But this is a very large commerce, and one of importance to this country generally. Great numbers of persons, from many States, are engaged in it; and many small steamers, barges, and other vessels concerned in it, are properly enrolled and licensed as vessels of the United States. Millions of dollars have been invested in property on the Schuylkill front of the built city, meant to assist the coal trade. The coal above spoken of as the subject of this river's commerce, is brought by canal-boats into the river, just at or above

Philadelphia. The canal-boats are then towed by small steam-tugs along the river.

So important, indeed, was this trade, in connection with the Schuylkill, considered in 1853, that in that year or thereabouts, when the legislature of the State proposed to allow the Penrose Ferry bridge—a bridge some distance *below* any ever previously erected, and over deeper and broader parts of the stream—the city of Philadelphia, by its councils, then largely, perhaps, influenced by traders in a great staple of the city, remonstrated against any legislative license for the new means of crossing; declaring that, by " this dangerous obstruction, trade amounting to more than a million of tons annually would be seriously impaired, and driven from that portion of the port; and that the large investments of the city in her gas-works, and other property on the Schuylkill, and a large proportion of all the wharf-front, would be greatly injured by any further bridge below Gray's Ferry, now the lowest bridge upon the Schuylkill." The bridge, however, was authorized.

The space from river to river—the width of the neck of land, that is to say, on which "Philadelphia" stands—may be about two miles.

Notwithstanding, however, the separating river, residents of Philadelphia, more than fifty years ago, had their rural homes on the west side of the Schuylkill. Here was Lansdowne, the Woodlands, and Belmont, and Solitude; well-known places in the local history of Philadelphia. Little villages, also, Mantuaville, Hamiltonville, &c., grew up there. From necessity, the great roads from the interior, including that from the State capital, came to the city in this direction. Still the region was without the city limits.

In 1854, the old charter of Philadelphia was abrogated. "Consolidation" was thought advisable. What had been the county of Philadelphia was made the city, and the region west of the Schuylkill was placed under the same government completely as the region east. Lighting, pav·ing, police, penny-postage, and such like things as had be fore belonged to the " city," now were imparted to the new

region. Mantuaville, Hamiltonville, &c., became forgotten titles; and "West Philadelphia" usurped, in common talk, their place. The streets running from east to west, in "Philadelphia," were carried, by name, and continuous line of survey, so far as practicable, west of the Schuylkill; and the numbers which, beginning in the old city on the Delaware with Front Street, and running westward *to* the Schuylkill, in progressive numbers up to Thirtieth, reappeared across the river in Thirty-first Street, running to a number not yet practically familiar to the citizens. From its cheaper ground and fresher air, in connection with street cars found west of the river as east, "West Philadelphia"— a sort, as yet, of *urbs in rure*, or *rus in urbe*—had become a residence for many hundreds of persons who passed more or less of every day in the walks of business in the older parts of the town.

So too of later years, the citizens had laid out various cemeteries, the Woodlands and others, on the western side of the river; and had here fixed numerous institutions closely connected with the city corporation, itself, or with churches, &c., in the city; the vast Blockley Hospital, the Burd Orphan Asylum, Christ Church Hospital, and other like establishments of charity.

From an early date the river at and just above and below the city, that is to say within its tidal and navigable parts, had been treated by the State of Pennsylvania as more or less within her jurisdiction.

Thus in 1798, what was then called the Permanent Bridge, a bridge across the river at Market Street, was authorized,* and in 1799 a lot granted by the State for its purposes.† This bridge was begun in 1801 and finished in 1805, Judge Peters, the district judge of the Federal court of Pennsylvania, himself distinguished as an admiralty lawyer, who was the proprietor of Belmont, near one end of it, having been chiefly instrumental in the erection. In 1806, a bridge at

---

\* 3 Smith's Laws, 312.                    † Id. 362.

Gray's Ferry (permanent) was authorized; 75 feet high.[*] In the same year the State regulated "the upper and lower ferries"[†] opposite the city. In 1811 another bridge was authorized, at the upper ferry,[‡] which was afterward built, burnt down, and rebuilt. In 1815 a large canal, the Schuylkill Navigation Company, was authorized, which drains the river immediately above the city.[§] It was completed in 1826. In 1822 the Fairmount Water-works, which *dam* the river and supply the old city of Philadelphia with water out of the river, were completed. In 1837[||] a bridge was authorized to be built by the Philadelphia, Wilmington, and Baltimore Railroad Company, with a draw of 33 feet, and was afterwards built below the town. In 1838[¶] the West Philadelphia Railroad Company was authorized to build a bridge at Market or Callowhill Street. In 1839[**] a free bridge was authorized at Arch Street. In 1852[††] free bridges were authorized at Chestnut Street and at Girard Avenue. *None of these last four bridges were ever built.*

Over one of these bridges runs the great Central Railroad of Pennsylvania; and over another, below the built city, the Gray's Ferry bridge already mentioned, runs the railway from Philadelphia to Baltimore, which leads from the North to Washington City and the South. This railroad bridge— which has a draw, however—was built in 1838; though a draw-bridge had been there from a time long before the Revolution.

The right of the State to authorize these bridges had not been seriously questioned by any one, while undoubtedly the river from its mouth to and beyond the port of Philadelphia is and has been considered as an ancient, navigable, public river and common highway, free to be used and navigated by all citizens of the United States.

The only legislation, apparently, which Congress had made about the river was in 1789 and in 1790, in both which

---

[*] 4 Sm. Laws, 297.   [†] Id. 347.   [‡] 5 Id. 221.   [§] 6 Id. 257.
[||] Pamphlet Laws of 1836–7, p. 20.   [¶] Pamphlet Laws of 1837–8, p. 697.
[**] Pamphlet Laws of 1838–9, p. 100.   [††] Pamphlet Laws of 1852.

years* Philadelphia was declared a port of entry; in 1793,†
when the coasting laws were applied to it; in 1799,‡ when
two districts were created in Pennsylvania;§ in 1822, when
Philadelphia was made the sole port of entry for the Phila-
delphia district; and in 1834,‖ when the limits of the port
were enlarged on the Delaware front.   The important acts
seemed to be those of 1799 and 1834.   The former is in these
words:

"The district of Philadelphia shall include all the shores and
waters of the River *Delaware, and the rivers and waters connected
therewith* lying within the State of Pennsylvania; and the *City
of Philadelphia* shall be the *sole port of entry and delivery of the
same.*"

The subsequent act (that of 1834) thus reads:

"The port of entry and delivery for the district of Phila-
delphia shall be bounded by the *Navy Yard on the south*, and
*Gunner's Run on the north*, anything in any former law to the
contrary notwithstanding."

No act spoke of the Schuylkill as within the port: though
undoubtedly by its charter the city extended to the Schuyl-
kill.   The soundings of the Coast Survey, authorized by the
United States, do not come into the Schuylkill.

The "Navy Yard" is on the Delaware.   "Gunner's Run"
was a stream in the north of the city, falling into the Dela-
ware; but nowhere touching or feeding the Schuylkill.

Notwithstanding, however, the numerous bridges author-
ized by the State and the two or three that had been built,
but one *principal* connection existed practically, between the
two parts of the built and populous city; and this was the
old Permanent or Market Street Bridge: a bridge running
from the western end of one great east and west thorough-
fare of the city—perhaps the greatest—across the stream;
and connecting West Philadelphia with the more populous
"city" as a short and narrow isthmus might connect two

---

* 1 Stat. at Large, 32, 148.                    † Id. 305.
‡ Id. 632.              § 3 Id. 662.              ‖ 4 Id. 715.

GILMAN
vs
PHILADELPHIA
To Face P. 718
3 Wallace

F. Bourquan Lith. 31 S. 6th St Phila

continents. There was, indeed, the Wire or Suspension Bridge, at Fairmount; rather above the city at its north extremity; and Gray's Ferry, sometimes called Baltimore Railroad Bridge, at its southern end, and below the populous districts. But, as already said, the old bridge was the great line of transit—artery and ligament at once—between the districts.

In this state of things, not much set out in the pleadings, but being matters of common notoriety, and as such spoken of at the bar, the Commonwealth of Pennsylvania in 1857 authorized the City of Philadelphia to erect a permanent bridge over the Schuylkill at Chestnut Street. This street was about five hundred feet below Market Street, where was the other and older bridge. The contemplated erection would be, of course, over a part of the Schuylkill that was tidal wholly, and navigable. Chestnut Street now had an existence on both sides of the river. On the eastern, it is one of the chief thoroughfares of Philadelphia, and in West Philadelphia, in anticipation of connection with Chestnut Street on the east, was daily assuming importance. The contemplated bridge would in fact connect parts of one street, municipally speaking; a street having one part on the east and one part on the west of the stream; here about four hundred feet across.

The city being about to begin the erection, Gilman, of New Hampshire, owning valuable coal wharves on the west side of the river, *just below the old bridge*, and which by the erection of the proposed bridge at Chestnut Street would be shut up between the two erections, now filed his bill in the Circuit Court for Pennsylvania to prevent the structure. It was conceded that he was neither a navigator nor a pilot, nor the owner of a licensed coasting vessel; and this was objected to him. His title to ask relief rested on his ownership of coal wharves, as mentioned, and his citizenship in New Hampshire.

His bill charged that a bridge at that point without suitable draws would be an unlawful obstruction to the navigation

of the river, and an illegal interference with his rights, and was a public *nuisance* producing to him a special damage; that it was not competent for the legislature of Pennsylvania to sanction such an erection, and that he was entitled to be protected by an injunction to stay further progress on the work, or to a decree of abatement, if it should have been proceeded with to completion.

The answer admitted the erection of the bridge complained of, justified such erection under the act of the legislature of Pennsylvania, and alleged that other obstructions of a similar or greater extent had theretofore been placed across the stream at a higher point of the river, or beyond the complainant's wharves, by virtue of other acts of the same legislature. The answer conceded that the bridge would prevent masted vessels from approaching to or unloading at the complainant's wharves, and insisted that this was the only injury suffered by the complainant, and that for it the City of Philadelphia, the defendant, was able to respond in damages. The answer further alleged that the proposed bridge was a necessity for public convenience.

The bridge, it was admitted, would be not more than thirty feet high—the same height as the old one above, at Market Street. Being an erection of the city it was built in the best style of science, and with the greatest practicable regard to the navigation and general interests of commerce; but it necessarily somewhat impeded navigation. The navigation at that point required a wide channel. One pier was indispensable. Vessels with masts could not pass, and the property of the complainant was rendered less valuable.

Mr. Justice Grier dismissed the bill. The same question nearly had been then recently considered by him very fully, in an application made, in New Jersey, to restrain the erection of a railroad bridge over the Passaic, at Newark. The matter had been there fully argued and deliberately considered; an opinion being delivered from the bench, dismissing the appeal. That decree had, by the judgment of this court, been affirmed; though the case was not reported, the judgment of affirmance having been by an

equally divided bench.  His honor, in accordance with what was declared in *Queen* v. *Willis*,* considering that an affirmance of a decree was binding irrespective of the number of judges who were in favor of such judgment; and that the obligation, in point of mere *precedent*, was the same, whether the court was full and unanimous, or partial and divided, hardly conceived the question open for discussion before him.†  The case was, therefore, not argued below.

In this court it was elaborately and well discussed by *Messrs. George Harding and Courtland Parker, for the appellant Gilman; and by Messrs. F. C. Brewster and D. W. Sellers, contra, for the City of Philadelphia.*

Mr. Justice SWAYNE delivered the opinion of the court.‡

There is no contest between the parties about the facts upon which they respectively rely.

The complainants are citizens of other States, and own a valuable and productive wharf and dock property above the site of the contemplated bridge.  The river is navigable there for vessels drawing from eighteen to twenty feet of water.  Commerce has been carried on in all kinds of vessels for many years to and from the complainants' property. The bridge will not be more than thirty feet above the ordinary high-water surface of the river, and hence will prevent the passage of vessels having masts.  This will largely reduce the income from the property, and render it less valuable.

The defendants are proceeding to build the bridge under the authority of an act of the legislature of Pennsylvania. The Schuylkill River is entirely within her limits, and is " an ancient river and common highway of the State."  For

---

* 10 Clark & Finnelly's Appeal Cases, 534.  See Krebs *v.* Carlisle Bank, 2 Wallace, Jr , note, 49.

† As part of the judicial history of an interesting question, as well as for the value which the opinion itself has, a report of the case referred to above and decided by Grier, J., will be found in a note.—See Appendix, No. III.

‡ Nelson, J., not having sat, and taking no part in the decision.

many years it has been navigable for masted vessels for the distance of about seven and a half miles only, from its mouth. At Market Street, about five hundred feet above Chestnut, there is a permanent bridge without a draw over the same river, and no higher above the water than it is intended to elevate the bridge about to be built. A bridge at Market Street was erected prior, perhaps, to the year eighteen hundred and nine. It rendered the passage of masted vessels above that point impossible, and since that time comparatively few have appeared above the foot of Chestnut Street. The river there has since been used chiefly as a highway for canal-boats.

The injury to the property of the complainants will be entirely consequential. A large city is rising up on the opposite side of the river. The new bridge is called for by public convenience.

The case resolves itself into questions of law.

At the threshold of the investigation we are met by the objection from the defendants, that the complainants, " not being specially interested in navigation, cannot intervene for its protection." It is said, " that they are not the owners of licensed coasting vessels, and are not pilots nor navigators."

As regards this objection, the case is not essentially different in principle from the Wheeling bridge case.

The further objection was also taken in that case, that if a nuisance existed, it was of a public nature, and was an offence against the sovereignty whose laws were violated, and that the sovereign only could intervene for the correction of the evil.

It was answered by the court, that wherever a public nuisance is productive of a specific injury to an individual, he may make it the foundation of an action at law, and if the injury would be irreparable, that a court of equity will interpose by injunction. The decision was not put in anywise upon the ground of the trustee character of the complainant. The State alleged that she had lines of improvements for the transportation of freight and passengers

extending from the east to Pittsburg, and that by reason of the bridge about to be erected across the river at Wheeling, and the obstruction which it would cause to the navigation of that stream, business would be diverted from her works to other channels, and that the income from her works would thereby be greatly lessened, and their value diminished or destroyed. The court said:

" The State of Pennsylvania is not a party in virtue of her sovereignty. It does not come here to protect the rights of its citizens, . . nor can the State prosecute the suit upon the ground of any remote or contingent interest in herself. It assumes and claims, not an abstract right, but a direct interest, and that the power of this court can redress its wrongs, and save it from irreparable injury. . . . In the present case, the rights assumed and relief prayed are in no respect different from those of an individual. From the dignity of the State, the Constitution gives to it a right to bring an original suit in this court, and this is the only privilege, if the right be established, which the State of Pennsylvania can claim in the present case."

In regard to the facts it was said:

" And this injury is of a character for which an action at law could afford no adequate redress. It is of daily occurrence, and would require numerous, if not daily, prosecutions for the wrong done; and from the nature of that wrong, the compensation could not be measured or ascertained with any degree of precision. The effect would be, if not to reduce the tolls on these lines of transportation, to prevent their increase with the increasing business of the country. . . . In no case could a remedy be more hopeless than an action at common law. The structure complained of is permanent, and so are the public works sought to be protected. The injury, if there be one, is as permanent as the works from which it proceeds, and as are the works affected by it. And whatever injury there may now be, will become greater in proportion to the increase of population and the commercial development of the country. And in a country like this, where there would seem to be no limit to its progress, the injury complained of would be far greater in its effects than under less prosperous circumstances."

The law upon the subject is learnedly and ably examined. The objections were overruled. Considerations of fact, of the same character with those adverted to, exist in the case before us, and the reasoning and conclusions there are alike applicable in both cases. Whatever might be our views upon the legal proposition, in the absence of this adjudication, we are, as we think, concluded by it. It is almost as important that the law should be settled permanently, as that it should be settled correctly. Its rules should be fixed deliberately and adhered to firmly, unless clearly erroneous. Vacillation is a serious evil. "*Misera est servitus ubi lex est vaga aut incerta.*" This brings us to the examination of the merits of the case.

The defendants assert that the act of the legislature, under which they are proceeding, justifies the building of the bridge.

The complainants insist that such an obstruction to the navigation of the river is repugnant to the Constitution and laws of the United States, touching the subject of commerce.

These provisions of the Constitution bear upon the subject:

"Congress shall have power . . to regulate commerce with foreign nations, among the several States, and with the Indian tribes ; . . to make all laws which shall be necessary and proper for carrying into execution the foregoing powers."

"This Constitution, and the laws which shall be made in pursuance thereof, . . shall be the supreme law of the land, and the judges in every State shall be bound thereby, anything in the constitution or laws of any State to the contrary notwithstanding."

"The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

The act of the 18th of February, 1793, authorizes vessels enrolled and licensed according to its provisions to engage in the coasting trade.

Commerce includes navigation. The power to regulate commerce comprehends the control for that purpose, and to the extent necessary, of all the navigable waters of the

United States which are accessible from a State other than those in which they lie.   For this purpose they are the public property of the nation, and subject to all the requisite legislation by Congress.*   This necessarily includes the power to keep them open and free from any obstruction to their navigation, interposed by the States or otherwise; to remove such obstructions when they exist; and to provide, by such sanctions as they may deem proper, against the occurrence of the evil and for the punishment of offenders.   For these purposes, Congress possesses all the powers which existed in the States before the adoption of the national Constitution, and which have always existed in the Parliament in England.

It is for Congress to determine when its full power shall be brought into activity, and as to the regulations and sanctions which shall be provided.†

A license under the act of 1793, to engage in the coasting trade, carries with it right and authority.   " Commerce among the States" does not stop at a State line.   Coming from abroad it penetrates wherever it can find navigable waters reaching from without into the interior, and may follow them up as far as navigation is practicable.   Wherever " commerce among the States" goes, the power of the nation, as represented in this court, goes with it to protect and enforce its rights.‡   There can be no doubt that the coasting trade may be carried on beyond where the bridge in question is to be built.

We will now turn our attention to the rights and powers of the States which are to be considered.

The national government possesses no powers but such as have been delegated to it.   The States have all but such as they have surrendered.   The power to authorize the building of bridges is not to be found in the Federal Constitution.

---

* Gibbons *v.* Ogden, 9 Wheaton, 1; Corfield *v.* Coryell, 4 Washington Circuit Court, 378.

† United States *v.* New Bedford Bridge, 1 Woodbury & Minot, 420, 421; United States *v.* Coombs, 12 Peters, 72; New York *v.* Milne, 11 Id. 102, 155.

‡ Gibbons *v.* Ogden, 9 Wheaton 1; Steamboat Co. *v.* Livingston, 3 Cowen, 713.

It has not been taken from the States. It must reside somewhere. They had it before the Constitution was adopted, and they have it still. "When the Revolution took place the people of each State became themselves sovereign, and in that character hold the absolute right to all their navigable waters and the soil under them for their own common use, subject only to the rights since surrendered by the Constitution to the General Government."*

In *Pollard's Lessee* v. *Hagan,*† this court said:

" The right of eminent domain over the shores and the soil under the navigable waters, *for all municipal purposes, belongs exclusively to the States* within their respective territorial jurisdictions, and they, and they only, have the constitutional power to exercise it. . . . . . . But in the hands of the States this power can never be used so as to affect the exercise of any national right of eminent domain or jurisdiction with which the United States have been invested by the Constitution. For although the territorial limits of Alabama have extended all her sovereign power into the sea, it is there, as on the shore, but *municipal power*, subject to the Constitution of the United States and *the laws which shall have been made in pursuance thereof.*"

In *Gibbons* v. *Ogden* it is said:

" Inspection laws form a portion of that immense mass of legislation which embraces everything within the territory of a State, not surrendered to the General Government; all which can be most advantageously exercised by the States themselves. Inspection laws, quarantine laws, health laws of every description, as well as laws for regulating the internal commerce of a State, and those which respect turnpike roads, ferries, &c., are component parts of this mass."

Bridges are of the same nature with ferries, and are undoubtedly within the category thus laid down.‡

The power to regulate commerce covers a wide field, and embraces a great variety of subjects. Some of these subjects call for uniform rules and national legislation; others can

---

* Martin et al. *v.* Waddell, 16 Peters, 410.     † 3 Howard, 230.
‡ People *v.* S. & R. R. R. Co., 15 Wendell, 113.

be best regulated by rules and provisions suggested by the varying circumstances of different localities, and limited in their operation to such localities respectively.  To this extent the power to regulate commerce may be exercised by the States.

Whether the power in any given case is vested exclusively in the General Government depends upon the nature of the subject to be regulated.  Pilot laws are regulations of commerce; but if a State enact them in good faith, and not covertly for another purpose, they are not in conflict with the power "to regulate commerce" committed to Congress by the Constitution.*

In the Wheeling bridge case this court placed its judgment upon the ground "that Congress had acted upon the subject, and had regulated the Ohio River, and had thereby secured to the public, by virtue of its authority, the free and unobstructed use of the same, and that the erection of the bridge, so far as it interfered with the enjoyment of this use, was inconsistent with and in violation of the acts of Congress, and destructive of the right derived under them; and that, to the extent of this interference with the free navigation of the Ohio River, the act of the legislature of Virginia afforded no authority or justification.  *It was in conflict with the acts of Congress, which were the paramount law.*"†

The most important authority, in its application to the case before us, is *Wilson v. The Blackbird Creek Marsh Co.*‡  Blackbird Creek extends from the Delaware River into the interior of the State of Delaware.  The legislature of the State passed an act whereby the company were " authorized and empowered to make and construct a good and sufficient dam across said creek, at such place as the managers or a majority of them shall find to be most suitable for the purpose," &c.  The company proceeded to erect a dam, whereby the navigation of the creek was obstructed.  The defendant, being the owner of a sloop of nearly a hundred tons, regu-

---

\* Cooly *v.* The Board of Wardens, 12 Howard, 319.
† 18 Id. 430.                              ‡ 2 Peters, 250

larly enrolled and licensed under the laws of the United States, broke and injured the dam. The company brought an action of trespass against him in the Supreme Court of Delaware. The defendant pleaded that the place where the trespass was committed was "a public and common navigable creek, in the nature of a highway, in which the tides had always flowed and reflowed; and that all the citizens of the United States had a right, with sloops, and other vessels, to navigate and pass over the same at all times at their pleasure," &c., and therefore, &c.

The plaintiffs demurred. The Supreme Court sustained the demurrer and gave judgment in their favor. The Court of Appeals of that State affirmed the judgment. The case was brought into this court by a writ of error. In delivering the opinion of the court, Chief Justice Marshall said:

"But the measure authorized by this act stops a navigable creek, and must be supposed to abridge the rights of those who have been accustomed to use it; but this abridgment, unless it comes in conflict with the Constitution or a law of the United States, is an affair between the government of Delaware and its citizens, of which this court can take no cognizance. The counsel for the plaintiffs in error insist that it comes in conflict with the power of the United States 'to regulate commerce with foreign nations and among the several States.'"

He remarked that if "Congress had passed any law which bore upon the subject the court would not feel much difficulty in saying that a State law, coming in conflict with such an act, would be void;" and added, in conclusion:

"But Congress has passed no such act. The repugnancy of the law of Delaware to the Constitution is placed entirely on its repugnancy to the power to regulate commerce with foreign nations and among the several States; a power which has not been so exercised as to affect the question. We do not think that the act empowering the Blackbird Creek Marsh Company to place a dam across the creek can, under all the circumstances of the case, be considered as repugnant to the power to regulate commerce in its dormant state, or as being in conflict with any law passed on the subject."

This opinion came from the same " expounder of the Constitution" who delivered the earlier and more elaborate judgment in *Gibbons* v. *Ogden*. We are not aware that the soundness of the principle upon which the court proceeded has been questioned in any later case. We can see no difference in principle between that case and the one before us. Both streams are affluents of the same larger river. Each is entirely within the State which authorized the obstruction. The dissimilarities are in facts which do not affect the legal question. Blackbird Creek is the less important water, but it had been navigable, and the obstruction was complete. If the Schuylkill is larger and its commerce greater, on the other hand, the obstruction will be only partial and the public convenience, to be promoted, is more imperative. In neither case is a law of Congress forbidding the obstruction an element to be considered. The point that the vessel was enrolled and licensed for the coasting trade was relied upon in that case by the counsel for the defendant. The court was silent upon the subject. A distinct denial of its materiality would not have been more significant. It seems to have been deemed of too little consequence to require notice. Without overruling the authority of that adjudication we cannot, by our judgment, annul the law of Pennsylvania.

It must not be forgotten that bridges, which are connecting parts of turnpikes, streets, and railroads, are means of commercial transportation, as well as navigable waters, and that the commerce which passes over a bridge may be much greater than would ever be transported on the water it obstructs.

It is for the municipal power to weigh the considerations which belong to the subject, and to decide which shall be preferred, and how far either shall be made subservient to the other. The States have always exercised this power, and from the nature and objects of the two systems of government they must always continue to exercise it, subject, however, in all cases, to the paramount authority of Congress, whenever the power of the States shall be exerted within the sphere of the commercial power which belongs to the nation.

The States may exercise concurrent or independent power in all cases but three:

1. Where the power is lodged exclusively in the Federal Constitution.

2. Where it is given to the United States and prohibited to the States.

3. Where, from the nature and subjects of the power, it must necessarily be exercised by the National Government exclusively.*

The power here in question does not, in our judgment, fall within either of these exceptions.

"It is no objection to distinct substantive powers that they may be exercised upon the same subject." It is not possible to fix definitely their respective boundaries. In some instances their action becomes blended; in some, the action of the State limits or displaces the action of the nation; in others, the action of the State is void, because it seeks to reach objects beyond the limits of State authority.

A State law, requiring an importer to pay for and take out a license before he should be permitted to sell a bale of imported goods, is void,† and a State law, which requires the master of a vessel, engaged in foreign commerce, to pay a certain sum to a State officer on account of each passenger brought from a foreign country into the State, is also void.‡ But, a State, in the exercise of its police power, may forbid spirituous liquor imported from abroad, or from another State, to be sold by retail or to be sold at all without a license; and it may visit the violation of the prohibition with such punishment as it may deem proper.§ Under quarantine laws, a vessel registered, or enrolled and licensed, may be stopped before entering her port of destination, or be afterwards removed and detained elsewhere, for an indefinite period; and a bale of goods, upon which the duties have or have not been paid, laden with infection, may be seized un-

---

* Houston v. Moore, 5 Wheaton, 49; Federalist, No. 32.

† Brown v. Maryland, 12 Wheaton, 419.

‡ Passengers' Cases, 7 Howard, 273.          § License Cases, 5 Id. 504.

der "health laws," and if it cannot be purged of its poison, may be committed to the flames.

The inconsistency between the powers of the States and the nation, as thus exhibited, is quite as great as in the case before us; but it does not necessarily involve collision or any other evil. None has hitherto been found to ensue. The public good is the end and aim of both.

If it be objected that the conclusion we have reached will arm the States with authority potent for evil, and liable to be abused, there are several answers worthy of consideration. The possible abuse of any power is no proof that it does not exist. Many abuses may arise in the legislation of the States which are wholly beyond the reach of the government of the nation. The safeguard and remedy are to be found in the virtue and intelligence of the people. They can make and unmake constitutions and laws; and from that tribunal there is no appeal. If a State exercise unwisely the power here in question, the evil consequences will fall chiefly upon her own citizens. They have more at stake than the citizens of any other State. Hence, there is as little danger of the abuse of this power as of any other reserved to the States. Whenever it shall be exercised openly or covertly for a purpose in conflict with the Constitution or laws of the United States, it will be within the power, and it will be the duty, of this court, to interpose with a vigor adequate to the correction of the evil. In the Pilot case, the dissenting judge drew an alarming picture of the evils to rush in at the breach made, as he alleged, in the Constitution. None have appeared. The stream of events has since flowed on without a ripple due to the influence of that adjudication. Lastly, Congress may interpose, whenever it shall be deemed necessary, by general or special laws. It may regulate all bridges over navigable waters, remove offending bridges, and punish those who shall thereafter erect them. Within the sphere of their authority both the legislative and judicial power of the nation are supreme. A different doctrine finds no warrant in the Constitution, and is abnormal and revolutionary.

Since the adoption of the Constitution there has been but one instance of such legislative interposition; that was to save, and not to destroy. The Wheeling bridge was legalized, and a decree of this court was, in effect, annulled by an act of Congress. The validity of the act, under the power "to regulate commerce," was distinctly recognized by this court in that case. This is, also, the only instance, occurring within the same period, in which the case has been deemed a proper one for the exercise, by this court, of its remedial power.

The defendants are proceeding in no wanton or aggressive spirit. The authority upon which they rely was given, and afterwards deliberately renewed by the State. The case stands before us as if the parties were the State of Pennsylvania and the United States. The river, being wholly within her limits, we cannot say the State has exceeded the bounds of her authority. Until the dormant power of the Constitution is awakened and made effective, by appropriate legislation, the reserved power of the States is plenary, and its exercise in good faith cannot be made the subject of review by this court. It is not denied that the defendants are justified if the law is valid. We find nothing in the record which would warrant us in disturbing the decree of the Circuit Court, which is, therefore,

AFFIRMED WITH COSTS.

Mr. Justice CLIFFORD (with whom concurred WAYNE and DAVIS, JJ.), dissenting:

I concur in many of the views expressed by the majority of the court in the introductory part of the opinion which has just been read; and if the decree of the court had been such as the propositions there laid down would seem to demand, I might have felt justified in remaining silent as to certain other propositions advanced in the concluding part of the opinion, which appear to be of an inconsistent character, and to which I can never assent. Such, however, is not the fact. On the contrary, the order of the court is that the decree entered in the court below, dismissing the bill of

complaint, be affirmed, and it must be understood that the majority of the court, in directing that decree, adopt the views expressed in the concluding part of the opinion, else they never could have agreed to that result. Regarding the matter in that light, it seems to be an obvious duty that I should express my dissent from the decree of the court, and briefly assign the reasons why I cannot concur in the conclu sion to which the majority of the court have come.

1. Complainants are the owners of a valuable wharf prop erty situated upon the River Schuylkill, within the port of Philadelphia, which is a port of entry established by an act of Congress passed at a very early period in the history of the country.*   They claim that the River Schuylkill is an ancient public river and common highway, and that it is navigable for ships and vessels of the largest description, from above their wharf property to the sea; that many of the ships and vessels navigating the river are duly enrolled and licensed at the port of Philadelphia and other ports of entry of the United States, under and by virtue of the acts of Congress in that behalf provided; and that foreign ves sels, entitled to certain rights of commerce and navigation, have long been accustomed to, and are of right entitled to navigate that river, with cargoes bound to the port of Phila delphia; and that such vessels, in pursuance of that right, have been accustomed to enter their cargoes at the port, and to discharge the same at the wharves of the port bordering on the river, and to load with return cargoes at the said wharves, and clear direct to foreign ports.

Injury alleged is, that the respondents have collected ma terials, employed workmen, and are now engaged in erecting and constructing a bridge across the channel of the river at Chestnut Street, in the city of Philadelphia, below the place where the wharf property of the complainants is situated. Bridge about to be erected is, as alleged, and as the plan shows, without any draw, and with but a single pier and at an elevation of only thirty-three feet above the ordinary water surface of the river.

---

* 1 Stat. at Large, 632.

Substance of the charge as contained in the bill of complaint is, that the erecting and keeping the bridge over and across the channel of the river, in the manner as proposed and threatened, will impede and obstruct the navigation of the river, and will hinder and interrupt the citizens in their lawful use of the same as a common and public highway; and they also charge that it will hinder and obstruct licenses granted under the enrolment act, and that it will hinder and obstruct the subjects of foreign countries in the exercise of their rights of commerce and navigation; and that it will interrupt, diminish, and greatly tend to destroy the trade, commerce, and business of the citizens upon the river, to the great damage and common nuisance of all the citizens of the United States, and their irreparable injury.

Statement of complainants is, that many millions of dollars have been expended by the citizens of the United States in the construction of works of public improvement, terminating at the head of tide-water navigation on that river, which depend, in a great measure, for their prosperity, usefulness, and value upon the free and unobstructed use of the river; and in this connection they charge that the bridge will greatly injure and lessen the value of their wharf property upon the river, and will divert commerce and trade therefrom, and will thereby diminish the tolls, revenue, and profits of their wharves, and will, in fact, destroy the trade and commerce to and from their wharves, to their great damage and irreparable injury.

Allegation of the bill of complaint also is, that the Schuylkill River, being a navigable river, and having a good tide-water navigation, extending to and beyond the wharf property of the complainants, and for about seven miles from its mouth, and being a branch of the River Delaware—which river passes by and between the States of New Jersey and Delaware—the citizens of all the States are lawfully entitled to its free navigation, and to carry on their lawful commerce without hindrance or obstruction by the respondents, under the pretence of State authority, or any pretence whatever.

Respondents justify, under an act of the General Assembly of the State of Pennsylvania, authorizing them to build the bridge described in the bill of complaint.

2. Complainants insist that the bridge is a public nuisance, and pray that it may be abated, and for such other and further relief in the premises as the nature of the case and equity and good conscience may require. Propositions of the complainants are, that the River Schuylkill is a public navigable river, subject to the power of Congress to regulate commerce with foreign nations and among the several States, as conferred in the Constitution; and that Congress has exercised that power, and regulated the navigation of that river within the meaning of the Constitution, and has thereby secured to the citizens of the several States, by virtue of their authority so conferred by the Constitution, the free and unobstructed use of the river as a paramount right, for all the purposes of commerce and navigation.

Congress, as the complainants say, has exercised the power and regulated the navigation of the river; and their next proposition is, that the bridge as constructed, or threatened to be constructed, interferes with the enjoyment of that use, and is inconsistent with, and in violation of the acts of Congress regulating the navigation, and destructive of the rights derived under them, and that to the extent of that interference with the free navigation of the river, the act of the legislature of the State of Pennsylvania affords to the respondents no authority or justification, because it is in conflict with the acts of Congress, which are the paramount law.

Argument to show that the ground assumed by the complainants is exactly the same as that on which the case of the Wheeling bridge proceeded and was finally decided, is unnecessary, because the proposition stands forever affirmed by the authority of this court, in an opinion pronounced by one of the justices who decided the cause, and who still holds a seat on this bench.* Referring to that opinion, it will be seen that the judge who delivered it first stated the

---

* The Wheeling Bridge, 18 Howard, 430.

grounds assumed in the bill of complaint, and then said: " Such being the view of the case taken by a majority of the court, they found no difficulty in arriving at the conclusion that the obstruction of the navigation of the river by the bridge was a violation of the right secured to the public by the Constitution and laws of Congress, nor in applying the appropriate remedy in behalf of the plaintiff." None of these propositions are denied in the introductory part of the opinion of the majority of the court. On the contrary, the opinion just read repeats the views expressed by Mr. Justice Nelson in the case already referred to, and impliedly indorses those views as a correct exposition of the power of Congress over public navigable rivers emptying into the sea, and of the right of this court to redress private injuries resulting from unlawful obstructions in the same, to the paramount right of navigation.

3. Conceding the correctness of those views as applied in the case in which they were expressed, the opinion of the majority of the court, as just read, sets up a distinction between that case and the case under consideration, and maintains that those views are not applicable to the present case. Stripped of all circumlocution, the supposed distinction, as maintained in the opinion of the majority of the court, is, that in the case at bar it does not appear that Congress has passed any act regulating the navigation of the river described in the bill of complaint. Power of Congress to regulate commerce among the several States, as well as with foreign nations, is fully admitted, and the concession is— at least impliedly from the course of the argument— that this court would have jurisdiction in the case, and that the complainants would be entitled to relief, if it appeared that Congress had exercised the power as conferred, and had regulated the navigation of the river within the meaning of the Constitution. Precise doctrine advanced, as I understand the opinion, is, that Congress has not passed any act regulating the navigation of the river, and that inasmuch as there is no Federal regulation upon the subject, the law of the State legislature, authorizing the erection of the bridge,

is a valid law, even if the bridge is an obstruction to navigation, because the State law is not in conflict with any act of Congress giving protection to the otherwise paramount right of navigation.  Implied admission is, that if there is an act of Congress regulating the navigation of the river, then the right of navigation is a paramount right, and the conclusion must be that, in that event, no law of the State could afford any justification to the respondents in erecting the bridge, if it is a public nuisance and an obstruction to that paramount right.*

4. Dissenting from the opinion of the majority of the court on this point, I hold that Congress has regulated the navigation of this river within the meaning of the Constitution, and that the law of the State, pleaded in justification of the acts of the respondents, so far as it authorizes an obstruction to the free navigation of the river, is an invalid law.  Commerce, it is admitted, includes navigation; and it is well settled, on the authority of this court, that in regulating commerce with foreign nations, or among the States, the power of Congress does not stop at the jurisdictional lines of the several States.  Express decision of this court is, that commerce with foreign nations is that of the whole United States, and that the power of Congress to regulate it may be exercised in the States wherever the foreign voyage may commence or terminate; and that the commerce among the States cannot be stopped at the exterior boundary of the State, but may be introduced into the interior.†

5. Right of intercourse between State and State was a common-law privilege, and as such was fully recognized and respected before the Constitution was formed.  Those who framed the instrument found it an existing right, and regarding the right as one of high national interest, they gave to Congress the power to regulate it.  Such were the views of Marshall, C. J., as expressed more than forty years ago;

---

* Attorney-General v. Burridge, 10 Price, 350; Same v. Parmeter, Id. 878; Parmeter v. Attorney-General, Id. 412.

† Gibbons v. Ogden, 9 Wheaton, 194.

and he added, that in the exercise of this power Congress
has passed an act for enrolling or licensing ships or vessels
to be employed in the coasting-trade and fisheries, and for
regulating the same.    Respondents contended that the en-
rolment act did not give the right to sail from port to port,
but confined itself to regulating a pre-existing right so far
only as to confer certain privileges on enrolled and licensed
vessels in its exercise; but the court promptly rejected the
proposition, and held that where the legislature attaches
certain privileges and exemptions to the exercise of a right
over which its control is absolute, the law must imply a
power to exercise the right.    Direct adjudication was, that
it would be contrary to all reason, and to the course of
human affairs, to say that a State is unable to strip a vessel
of the particular privileges attendant on the exercise of a
right, and yet may annul the right itself.

License, as the word is used in that act of Congress,
means, say the court, permission or authority; and the court
held that a license to do any particular thing is a permission
or authority to do that thing, and if granted by a person
having power to grant it, transfers to the grantee the right
to do whatever it purports to authorize.    Adopting the lan-
guage of the court in that case, it certainly transfers to him
all the right which the grantor can transfer to do what is
within the terms of the license.

Ships and vessels enrolled and licensed under the acts of
Congress, and no others, are deemed ships and vessels of the
United States entitled to the privileges of ships or vessels
employed in the coasting trade.    Majority of the court, as
stated in the opinion just read, admit that a ship or vessel
of the United States, which is duly enrolled and armed with
a coasting license, such as is required by the enrolment acts,
may navigate along the coast of the United States, and may
pass from the open sea into the public navigable rivers of
the United States, and up the same as far as navigable
waters extend.    Coming more directly to the case under
consideration, the opinion admits that such a ship or vessel
has a right, under such an enrolment and with such a coast-

ing license, to navigate from the sea up the river described in the record to the wharves of the complainants.

6. Unrestricted and unexplained, that admission covers everything which the complainants claim, and shows conclusively that they are entitled to relief. But it is said that this right, under the circumstances of this case, is subject to the paramount right of the State to bridge or dam the river, and close it against all commercial intercourse. Extent of the right as conceded, therefore, is, that a ship or vessel duly enrolled and licensed, and sailing from the port of another State, may enter a public navigable river of the United States from the sea, unless the State through which the river flows as it falls into the sea has bridged the river, or constructed a dam across it, before the vessel arrives off the mouth of the river. Plain right of the owner of the vessel, in that state of the case, is to instruct the master to go about and return to the port of departure; but if the river is open when the ship or vessel arrives at its mouth, she may pass up to the highest port of entry, and discharge cargo and load for the return trip.

Her right to return is then undoubted, unless in the meantime the navigation of the river is forever closed by a bridge or dam constructed under the authority of the State, and in that event the owner of the vessel has the same privilege that he has in case of shipwreck. He may direct the master and mariners to return by land.

Doubtless a question may arise as to what is to be done in that state of the case with the impounded vessel and cargo, but, as that question is not involved in the present record, it must be left for future consideration. Such a rule as it seems to me, is contrary to all reason, and absolutely subversive of one of the great interests of the country, which, more than any other, induced the people of the colonies to call the convention which framed the Constitution.

7. Unquestionably the decision of the court in the case of *Gibbons* v. *Ogden* proceeded throughout upon the ground that the act for enrolling or licensing ships or vessels, to be employed in the coasting trade and fisheries, and for regulating

the same, was of itself a sufficient regulation of the navigation of all the public navigable rivers of the United States to secure to the ships and vessels of the United States, sailing under the coasting license, the free navigation of all such public highways. Best exposition of the decision of the court in that case is to be found in the decree, where the court say that the several licenses set up by the appellant in his answer to the bill of complaint, which were granted under an act of Congress passed in pursuance of the Constitution of the United States, gave full authority to those vessels to navigate the waters of the United States for the purpose of carrying on the coastwise trade, any law of the State to the contrary notwithstanding; and that so much of the laws of the State as prohibited vessels so licensed from navigating the waters of the State by means of fire or steam is repugnant to the Constitution of the United States and void. Express as the language of that decree is, it is incomprehensible to me how it can be the subject of any difference of opinion.

Complete protection is afforded by the doctrines of that great case to all ships and vessels of the United States, duly enrolled and licensed, in navigating all the public navigable rivers of the United States which empty into the sea or into the bays and gulfs, which form a part of the sea, and they are all treated as arms of the sea and public rivers of the United States. None of the judges who participated in that decision even intimated that the Hudson was anything else than an arm of the sea and a public navigable river of the United States. Public navigable rivers, whose waters fall into the sea, are rivers of the United States in the sense of the law of nations and of the Constitution of the United States. They are so treated by all writers upon public law, and there is no well-considered decision of the Federal courts which does not treat them in the same way.*

8. Claim of the appellants, however, does not rest alone upon the doctrines of that case, but the proofs show that

---

* Propeller Commerce, 1 Black, 579.

their wharf property and the river at the place where it is situated are both within a port of entry, as established by an act of Congress.

Prior to the adoption of the Constitution the power to establish ports of entry was in the several States, but this court held, in the last opinion delivered in the case of the Wheeling bridge,* that the power in that behalf, was surrendered under the Constitution to the Federal Government, and left to Congress. Eighth section of the act of the 2d of March, 1799, provides that the district of Philadelphia shall include all the shores and waters of the River Delaware *and the rivers and waters connected therewith* lying within the State of Pennsylvania; and that the city of Philadelphia shall be the sole port of entry for the same.†

Subsequent provision is, that the port of entry and delivery for the district of Philadelphia shall be bounded by the navy yard on the south, and Gunner's Run on the north, anything in any former law to the contrary notwithstanding.‡

Appellees suggest rather than argue that the mouth of the river described in the bill of complaint is not included in that description, but the point is of no importance, because it is clear, beyond controversy, that the river at the place where the wharf property of the complainants is situated, and for a considerable distance above and below it, is within the acknowledged limits of the port. Ample confirmation of this view, if any be needed, will be found in the case of *Devoe et al.* v. *Penrose Ferry Bridge Co.*,§ which was decided by Mr. Justice Grier. He said the commerce on River Schuylkill below the port of Philadelphia is as much entitled to protection as that of the Ohio, Mississippi, Delaware, or Hudson; and that the complainants in that case had the same right to the interference of the court in their behalf as was shown by the State of Pennsylvania in the Wheeling bridge case. Although it is supposed the views of the learned judge have undergone some change as to the

---

* 18 Howard, 435.    † 1 Stat. at Large, 632.
‡ 4 Id. 715.    § 3 American Law Register, 83.

jurisdiction of the Federal courts, it has always been supposed that he was entirely accurate in all the matters of fact on which the judgment of the court was founded.

9. Other acts of Congress are cited by the complainants as supporting the proposition under consideration, but it will not be necessary to give more than two of them any special examination. First section of the act of the 2d of March, 1819, divides the sea-coast and *navigable rivers of the United States* into two great districts, and the declared purpose of creating the districts is "for the more convenient *regulation* of the coasting trade." All the districts on the sea-coast and navigable rivers between the eastern limits of the United States and the southern limits of Georgia are included in the first district, and the second district includes all the districts on the sea-coast and *navigable rivers* between the River Perdido and the western limits of the United States.*

Subsequent acts created a third great district, and provided that it should include all the ports, harbors, sea-coasts, and *navigable rivers* between the southern limits of Georgia and the River Perdido, and that it should be subject to all the regulations and provisions of the prior act.†

Doubt, therefore, cannot be entertained that all of the public navigable rivers of the United States falling into the sea, or into the bays and gulfs which form a part of the sea, are included in one or the other of the three great commercial districts expressly established for the convenient regulation of the coasting trade.

Looking at these several acts it is not surprising that Marshall, C. J., should have said, in *Gibbons* v. *Ogden,* that "to the court it seems clear that the whole act on the subject of the coasting trade, according to those principles which govern the construction of statutes, implies, unequivocally, an authority to licensed vessels to carry on the coasting trade." Strong support to that view of the law is also derived from the case of the Wheeling bridge, as appears in the first opinion delivered in the case.‡

---

* 3 Stat. at Large, 492.            † Id. 685.
‡ Wheeling Bridge, 13 Howard, 557.

Remarking upon this view of the case, the court say in effect that the navigability of the Ohio River is a historical fact which all courts may recognize. They add that for many years the commerce upon it has *been regulated* by Congress, under the commercial power, by establishing ports, requiring vessels which navigate it to take out licenses and to observe certain rules for the safety of their passengers and cargoes. Every one of those acts of Congress, from the moment they were passed, became and are, as applicable to the river described in the bill of complaint as to the Ohio, and there can be no doubt, as it seems to me, that they must be held to have the same effect. Nothing has been said respecting the case of *Wilson* v. *Blackbird Creek*,\* because, in the view I take of it, the opinion has nothing to do with the present question. Judgment was rendered by the same court in that case which gave judgment in the case of *Gibbons* v. *Ogden*, and there is not a man living, I suppose, who has any reason to conclude that the constitutional views of the court had at that time undergone any change.

Instead of overruling that case, it will be seen that the Chief Justice who gave the opinion did not even allude to it, although as a sound exposition of the Constitution of the United States it is second in point of importance to no one which that great magistrate ever delivered. Evidently he had no occasion to refer to it or to any of its doctrines, as he spoke of the creek mentioned in the case as a low, sluggish water, of little or no importance, and treated the erection described in the bill of complaint as one adapted to reclaim the adjacent marshes and as essential to the public health, and sustained the constitutionality of the law authorizing the erection upon the ground that it was within the reserved police powers of the State.

Conclusion is, that Congress has regulated the navigation of this river, and that the State law under which the respondents attempt to justify is in conflict with those regulations, and therefore is void, and affords no justification to the re-

---

\* 2 Peters, 250.

spondents.　Admitting the facts to be so, then the complain-
ants are entitled to recover even upon the principle main-
tained in the opinion of the majority of the court.