## THE CLYMENE.*

*(District Court, E. D. Pennsylvania. October 12, 1881.)*

1. CONSTITUTIONAL LAW—PILOTAGE—AUTHORITY OF STATE.

    Under the acts of congress of August 7, 1789, and March 2, 1837, each state has authority over the subject of pilotage on the navigable waters within its limits, although such authority is not exclusive.

2. SAME.

    Each state may, therefore, license pilots and provide regulations for their government and employment, but it cannot exclude others duly licensed elsewhere from employment on the public waters of the nation, either on the ground that those waters are within the territorial limits or on the ground that the vessel to be piloted is bound to a port within its territory.

*Reported by Frank P. Prichard, Esq., of the Philadelphia bar.

3. SAME—STATUTE EXERCISING EXCLUSIVE JURISDICTION—INVALIDITY OF.

A state statute which prohibits any one not licensed under the authority of the state from piloting a vessel to a port within the state is void, so far as it interferes with the employment, on public waters, of pilots licensed by other states bordering thereon.

4. SAME—PILOTAGE LAWS OF PENNSYLVANIA AND DELAWARE.

A pilot licensed by the state of Delaware *held* entitled to recover for services in piloting a vessel up the Delaware bay and river to Philadelphia, notwithstanding a law of Pennsylvania prohibiting any one from acting as such pilot without a Pennsylvania license.

In Admiralty. Hearing on libel and answer.

This was a libel by Robert C. Chambers, pilot, against the steamship Clymene, setting forth that in June, 1881, the steamship being at the entrance of Delaware bay, libellant boarded her and offered his services as pilot to conduct her to Philadelphia, her port of destination; that his services were accepted, and that he did pilot the steamship to Philadelphia. The libel further set forth that libellant was a regular pilot under an act of assembly of the state of Delaware, passed April 5, 1881, and that he was entitled to the pilotage fees prescribed by that act, but that the master of the steamship refused to pay the same.

The answer of the master admitted the performance of the pilotage service, but set forth that from the year 1803 to the passage of the Delaware act of April 5, 1881, under which libellant claimed, there was no system of pilotage laws in force on the bay and river Delaware, except the law enacted by the state of Pennsylvania, March 29, 1803, (4 Sm. Laws, 73,) and that during the same period there were no pilots on said bay and river except those licensed under said act of 1803 by the board of wardens of the port of Philadelphia, under whose license libellant himself acted as pilot for several years, until he surrendered the same and took a license from the state of Delaware under the act of April 5, 1881; that when libellant boarded the steamship she was on the high seas, and respondent, without making any contract with libellant, allowed him to act as pilot, supposing that he was duly licensed under the laws of Pennsylvania; that respondent was advised that the state of Delaware had no power to require vessels bound to the port of Philadelphia to take a pilot or to regulate his compensation, and that the act of April 5, 1881, had no extraterritorial virtue; that by an act of assembly of the state of Pennsylvania, approved February 4, 1846, (P. Laws, 30,) it is made an indictable offence for any person to pilot a vessel into the port of Philadelphia without a license from the board of wardens, and that as libellant had no such license his services were illegal, and he could not recover therefor.

*Henry Flanders* and *Hon. Thomas F. Bayard*, for libellant.

*Henry G. Ward, Morton P. Henry*, and *Richard C. McMurtrie*, for respondent.

BUTLER, D. J. The claim is for services rendered in piloting the respondent up the Delaware bay and river to Philadelphia. The tender and acceptance of the service, as well as its performance, is

admitted by the answer. The refusal to pay is rested on an allegation that the libellant had no authority to perform the service,—that he was liable to indictment, under the laws of Pennsylvania, for performing it, and that the service was accepted in ignorance of such want of authority. The libellant was duly licensed under a statute of the state of Delaware, approved April 5, 1881. Does this license authorize him to do what he undertook? This is the only question presented. Jurisdiction over the subject of pilotage, is conferred upon the federal government by the third clause of article 8 of the constitution,—which provides for the regulation of commerce: *Cooley* v. *The Port Wardens*, 12 How. 299. Whether the states might exercise jurisdiction until such time as congress should interfere, is a vexed question,—about which the judges disagreed in the case cited. To sustain such jurisdiction it must be held that the constitutional grant of authority to the federal government did not, of itself, oust the authority of the states. While such a view might seem to be illogical, it is not inconsistent with what has frequently been asserted by the supreme court in similar cases. As is said in *Henderson* v. *The Mayor*, 92 U. S. 259:

"It is stated in the decisions of this court that there is a kind of neutral ground, especially in that covered by the regulations of commerce, which may be occupied by the states, and its legislation be valid, so long as it interferes with no act of congress or treaty of the United States. Such a proposition is supported by the opinions of several of the judges in *The Passenger Cases*, 7 How. 283; *Cooley* v. *The Port Wardens*, Id.; and by the cases of *Crandall* v. *Nevada*, 6 Wall. 35, and *Gilman* v. *Philadelphia*, 3 Wall. 713. But the doctrine has always been controverted in the court, and has seldom, if ever, been stated without dissent."

As, however, congress did interfere, by the statutes of 1789* and 1837,† the jurisdiction of the states is now confined within the limits thus prescribed. The first of these statutes adopted the existing laws of the states, regulating and governing the subject of pilotage, and provided for the adoption of such others as they might thereafter make,—thus conferring upon the acts of the state legislatures the effect of federal statutes. Its language is as follows:

"All pilots in the bays, inlets, rivers, harbors and ports of the United States shall continue to be regulated in conformity with the existing laws of the states respectively, wherein such pilots may be, or with such laws as the states may respectively hereafter enact for the purpose, until further legislative provision shall be made by congress."

It might readily have been foreseen that the states, thus left to

*1 St. 54.      †5 St. 153.

separate, independent action, would soon come in conflict. Two or more, bounding on the same water, each intent upon its individual interests, would be impelled to inconsistent hostile legislation. Such a result did follow, and to provide for it, congress in March, 1837, enacted—

"That it shall and may be lawful for the master or commander of any vessel coming into, or going out of, any port situate upon waters which are the boundary between two states, to employ any pilot duly authorized or licensed by the laws of either of the states bounded by said waters, to pilot said vessel to or from said port, any law, usage or custom to the contrary notwithstanding."

The first of these statutes conferred on the state of Delaware (if she had it not before) authority over the subject of pilotage, on the navigable waters within her limits. Such at least was its effect. I do not mean to say that the authority thus conferred (or recognized) was *exclusive*, and might lawfully be exercised in hostility to her neighbors,—even before the enactment of the subsequent statute. I believe, indeed, that it was not exclusive; and that it could only be exercised in such manner as was consistent with the relations which the several states bear to each other as members of the federal government. *Gibbons* v. *Ogden*, 9 Wheat. 1; *The Daniel Ball*, 10 Wall. 563; *The Montello*, 11 Wall 411. The subsequent statute did not interfere with the proper exercise of this authority, but put the question just suggested at rest, by providing against such abusive, hostile exercise of it. She may license pilots, and provide regulations for their government and employment, but she may not exclude others, duly licensed elsewhere, from employment on the public waters of the nation, because these waters happen to be within her territorial limits. Those from Pennsylvania, as well as her own, may lawfully exercise their calling there, and vessels requiring such service may elect whom they will employ. That this statute was intended to apply to circumstances such as exist in this case I cannot doubt. They are clearly within its spirit, and with a just interpretation of its language, as clearly within its terms. It was so understood and applied by the supreme court of Pennsylvania in *Flanigen* v. *Ins. Co.* 7 Barr, 306; and so construed by congress in the subsequent statute of February, 1847, relating to the same subject.

In this view of the case the respondent's contention that "pilotage is the subject of local regulation of the state in which the port lies," and therefore that Pennsylvania, in the absence of statutory prohi-

bition, has exclusive jurisdiction of pilotage respecting the port of Philadelphia and its commerce, is unimportant. It is not improper, however, to say (as before intimated) that I could not adopt this position, even in the absence of the statute last referred to. The relations of the states as members of the general government,—the fact that they are not separate independencies, and that the navigable waters within their respective limits are subject to common use,—must be constantly kept in view. The commerce on the Delaware bay and river, no matter where from or where bound, does not belong to Pennsylvania. That she and her citizens derive a larger share of benefit from it than her neighbors, is her good fortune, but it confers no right on her to say who shall enter a port within her limits, or what pilot shall be employed. The port itself, constituted of the public waters of the nation,—is not hers; and it is but by the grace of the general government that she is allowed any independent voice respecting it. In the absence of the statute of 1837, that of 1789, construed in the light of these facts, must have been held to confer on Pennsylvania, I believe, such authority only as is here conceded to her. Before the adoption of the federal constitution she had no jurisdiction whatever beyond her territorial limits. Since that event she has none (even within) except such as congress has conceded to her. She must be content, therefore, with a voice on the subject in common with her neighbors, who with her border on the waters which constitute her and their outlet to the sea.

It follows from what has been said that the libellant was a duly licensed pilot, authorized to do what he undertook; and that any law of Pennsylvania designed to interfere with him in this respect, is inoperative and void. It also follows that the provision of the Delaware statute, which contemplates an *exclusive* jurisdiction over the subject on waters within her limits,—by requiring "that any person exercising the profession of a pilot in the bay and river Delaware shall * * * apply in person to the board of pilot commissioners (of the state of Delaware) for a license to entitle him to follow that occupation,"—is equally inoperative and void.

A decree must be entered in favor of the libellant for the amount claimed.

NOTE. The act of assembly of Pennsylvania of March 29, 1803, (4 Sm. Laws, 73,) provided *inter alia* that—

" Every person exercising the profession of a pilot in the bay or river Delaware shall * * * apply in person to the board of wardens for the port of

Philadelphia for a license; * * * and that it shall be the duty of at least three of the said wardens to examine every person so applying, * * * and to grant licenses to all such as they shall deem qualified. * * *"

The act of assembly of Pennsylvania of February 4, 1846, (P. L. 30,) provides:

"If any person * * * shall undertake to pilot any vessel in the bay or river Delaware * * * without a license duly granted by the board of wardens of the port of Philadelphia, * * * every person so offending shall, upon conviction thereof, be imprisoned for not less than one month nor more than one year, and be fined any sum not exceeding $200, at the discretion of the court."

The act of assembly of Pennsylvania of March 24, 1851, (P. L. 229,) provided that "every vessel arriving from or bound to any foreign port * * * shall be obliged to take a pilot. * * *"

The act of assembly of the state of Delaware of April 5, 1881, provided *inter alia*—

"That any person exercising the profession of a pilot on the bay and river Delaware shall * * * apply in person to the board of pilot commissioners for a license, * * * and that it shall be the duty of at least three of said board to examine every person so applying, * * * and to grant licenses to all such as they shall deem qualified; * * * and if any person shall * * * exercise the profession of pilot in the bay and river Delaware without such license, * * * he shall forfeit for every vessel which he shall undertake to pilot * * * $30, together with the pilotage to which he would be otherwise entitled. * * * That every ship or vessel * * * passing in or out of Delaware bay by the way of Cape Henlopen shall be obliged to receive a pilot; * * * that the pilot who shall first offer himself to any inward-bound ships or vessels shall be entitled to take charge thereof. * * *"