## THE STATE OF KANSAS v. F. W. FULKER.

INTOXICATING LIQUORS, *Imported and Sold in Original Packages — Illegal Sale — Interstate Commerce.* Intoxicating liquors, transported from another state to a point in Kansas, are subject to the laws of Kansas relating to the sale and disposition of such property, to the same extent and in like manner as are other intoxicating liquors already rightfully existing in the state, and cannot be sold at the place of destination in the original packages or other form, except as the laws of the state prescribe. The police power of the state, so exercised, does not infringe on the power delegated to congress to regulate commerce between the states.

*Appeal from Marshall District Court.*

PROSECUTION for a violation of the prohibitory liquor law. Conviction and sentence at the May term, 1889. The defendant *Fulker* appeals. The material facts are stated in the opinion, filed on January 11, 1890.

*A. L. Williams,* and *D. C. Lockwood,* for appellant.

*L. B. Kellogg,* attorney general, for The State.

The opinion of the court was delivered by

JOHNSTON, J.: F. W. Fulker was prosecuted in the district court of Marshall county upon an indictment charging him with unlawfully selling intoxicating liquors at the town of Oketo, in Marshall county. The jury returned a verdict finding him guilty on five counts of the indictment, and on his motion to set aside the verdict the conviction was sustained as to the first two counts, and set aside as to the other three. The judgment of the court was that he should pay a fine of $100 and be imprisoned in the jail of Marshall county for thirty days on the first count, and a like sentence for the conviction under the second count was pronounced. The defendant appeals, and alleges that the court erred in overruling his motion for a new trial.

The testimony offered on the trial showed that the defendant sold to numerous persons what were called "prize packages," being boxes about twelve inches square, in each of which there was a jug of whisky. These boxes were shipped from Nebraska, and were sold in Kansas by the defendant in the same form and condition in which they were shipped. The defendant was in charge of the railroad depot and express office at Oketo, and the boxes were shipped by express from Blue Springs, Nebraska. Part of them, at least, were consigned by "M. L. R." to "M. L. Rawling," but who "M. L. R." was is not very clearly shown. Some of those who applied to purchase liquor from the defendant presented orders, which purported to come from Rawling and from a man called "Ax;" but the testimony indicates that the defendant sold to all who applied, regardless of orders, and that many sales were made when no such orders were presented.

At the close of the testimony the defendant asked the court to instruct the jury that, if packages containing intoxicating liquors were sold by the defendant in the original packages as delivered for shipment in Nebraska, and as received by him in Kansas, such sales were not in violation of the constitution and laws of Kansas relating to the sale of intoxi-

cating liquors.   The request was refused, and in charging the jury the court said:

"I further instruct you that if you believe from the evidence, beyond a reasonable doubt, the defendant knowingly sold intoxicating liquors at the place described in the complaint, and within two years prior to the 22d day of December, 1888, it would be no defense against such sales for the defendant to show by evidence that such intoxicating liquor so sold by him had been imported from another state over some route ordinarily used for the transportation of merchandise, in inclosed boxes, or packages, and that such intoxicating liquors had been so sold by the defendant in the original boxes or packages in which they had been placed for shipment in another state, without breaking said boxes or packages."

The refusal of the first-mentioned instruction, and the giving of the second, present the only question discussed upon the appeal.   It is urged that intoxicating liquors transported from another state to Kansas may be sold by the importer, or person to whom they are shipped, in the original packages, free from state control, and that, so far as our constitution and laws would restrict or prohibit such sale, they violate the provision of the federal constitution which declares, "That congress shall regulate commerce among the several states." Counsel for appellant argue with great ability that in interpreting the commercial clause of the constitution intoxicating liquors must be regarded as articles of commerce which may be imported from another state, and sold at the end of the transit in this state the same as other commodities; and that the restriction of our laws upon the sale of liquors upon reaching Kansas is a direct burden on interstate commerce, and a usurpation by the state of a power exclusively vested in congress.   We cannot assent to this proposition.   That the power to regulate interstate commerce belongs exclusively to congress, and that the laws of a state which would encroach upon that power or directly interfere with such commerce cannot stand, all concede.   Nothing in the constitution or statutes of Kansas

Police power; evinces any purpose on the part of the people of
interstate com- the state to trench upon this power, or antagonize
merce; no in-
fringement. the freest commercial intercourse with other states.
It is not necessary to review at length the statutory provisions
relating to the manufacture and sale of intoxicating liquors
within the state.   It is enough to say that they do not pur-
port to restrict in any manner the transportation of liquors
into or through the state.   Such property may be carried over
the state without burden or restraint, the same as any other
commodity; and there is like freedom in bringing it in.   When
liquors are brought from another state, they are subject to no
other or different regulation than like property produced in
Kansas.   Our law is enforced with perfect equality, without
any discrimination between citizens of this and other states,
or between liquor brought in and that already here.   The
validity of our statute has been repeatedly sustained by this
court, and all question of the right of the state to enact such
legislation has been set at rest by the decisions of the supreme
court of the United States in *Foster v. Kansas*, 112 U.S. 201,
and *Mugler v. Kansas*, 123 id. 623.   In the latter case it was
held, after a most elaborate and learned treatment of the ques-
tions involved, that our laws were not repugnant to the federal
constitution, and it was said that, "It is difficult to perceive
any ground for the judiciary to declare that the prohibition
by Kansas of the manufacture or sale, within her limits, of
intoxicating liquors for general use there as a beverage, is not
fairly adapted to the end of protecting the community against
the evils which confessedly result from the excessive use of
ardent spirits." ·

It is argued that the unrestricted sale of liquors in the form
in which they are shipped from another state is an essential
element of traffic, and that as the law of Kansas forbids such
a sale, it constitutes a direct burden on interstate commerce.
It must be remembered that our law does not absolutely for-
bid the use or sale of intoxicating liquors.   They may not
only be freely introduced and stored, but they may be sold for

medical, scientific and mechanical purposes. A person may purchase and bring liquor into the state for his own use without violating the statute; and one so lawfully obtaining possession of intoxicating liquor may use it as he sees fit, by drinking it himself or giving it to another, provided it is done in good faith, and not as a shift or device to evade the provisions of the prohibitory act. (*The State v. Standish*, 37 Kas. 643.) So it appears that the law does not absolutely prohibit the importer from using or selling liquors, but it only requires that the sales shall be made for beneficial and proper purposes, and by duly-authorized persons. It does not operate directly on commerce, or upon the introduction of liquors, but only provides that they shall be subject to a reasonable police regulation when brought within the territorial limits of the state. The fact that such regulations may to some extent diminish the traffic or incidentally affect interstate commerce does not render them invalid.

"In conferring upon congress the regulation of commerce, it was never intended to cut the states off from legislating on all subjects relating to health, life and safety of their citizens, though the legislation might indirectly affect the commerce of the country. Legislation in a great variety of ways may affect commerce and persons engaged in it without constituting a regulation of it, within the meaning of the constitution." (*Sherlock v. Alling*, 93 U. S. 99.)

See also *Willson v. Blackbird Creek*, 2 Pet. 245; *Gilman v. Philadelphia*, 3 Wall. 713; *Cooley v. Board of Wardens*, 12 How. 299; *Osborne v. Mobile*, 83 U. S. 479; *Munn v. Illinois*, 94 id. 113; *Hall v. De Cuir*, 95 id. 485; *Pound v. Turck*, 95 id. 459; *Transportation Co. v. Wheeling*, 99 id. 273; *Ferry Co. v. East St. Louis*, 107 id. 365; *Morgan v. Louisiana*, 118 id. 455.

The regulation and control of the liquor traffic is purely an exercise of the police power of the state, and between it and the commercial power conferred on the general government there is no antagonism. The commercial power is delegated to congress, and cannot be limited by the states, but the police power is reserved to and remains alone with the

state. These powers are to be exercised by the different departments of government, for the public good, and both are to be construed relatively, and considered with reference to each other. The power to provide for the preservation of the morals, the health, the safety and lives of the people, was never surrendered by the states, and it is a power which can be most advantageously exercised by local regulation. It is not denied that the unrestrained use of intoxicating liquor destroys the health, contaminates public morals, and produces disorder and crime. The supreme court of the United States sufficiently shows the necessity of police regulation of the traffic, in the Mugler case, where it is said that it could not "shut out of view the fact, within the knowledge of all, that the public health, the public morals, and the public safety, may be endangered by the general use of intoxicating drinks; nor the fact, established by statistics accessible to everyone, that the idleness, disorder, pauperism and crime existing in the country are, in some degree at least, traceable to this evil." By reason of this necessity many local regulations, such as inspection, quarantine, and pilot laws, which directly affect commerce, have been upheld. In *Gibbons v. Ogden*, 9 Wheat. 1, Chief Justice Marshall said that "inspection laws, quarantine laws, and health laws of every description" are component parts of that mass of legislation "not surrendered to the general government," which "can be most advantageously exercised by the states themselves;" that such laws "are considered as flowing from the acknowledged power of a state to provide for the health of its citizens." In a case where the same court was considering the relative operations and limits of the commercial and police powers, it was said: "While we unhesitatingly admit that a state may pass sanitary laws, and laws for the protection of life, liberty, health, or property within its borders; while it may prevent persons and animals suffering from contagious or infectious diseases, or convicts, from entering the state; while, for the purpose of self-protection, it may establish quarantine and reasonable inspection laws, it may not interfere with transportation

into or through the state, beyond what is absolutely *necessary for its self-protection;*" and that "the police power of a state cannot obstruct foreign commerce or interstate commerce beyond the *necessity for its exercise.*" (*Rld. Co. v. Husen,* 95 U. S. 465.) This authority in effect concedes that although the state cannot, under the mere guise of exercising police power, limit or obstruct the federal power, yet it may go as far as it may be necessary to protect the lives, health and morals of its people without intruding upon the domain of federal authority. As the restriction of the liquor traffic is an acknowledged necessity, and as the state alone can effectually lessen or prevent the evils resulting from its use and sale, it would seem clear that laws enacted in good faith for that purpose by a state cannot be regarded as an infringement upon the delegated power "to regulate commerce." Although intoxicating liquors must be regarded as property, the quality or kind of property affects the question of whether it may be sold at the end of the transportation in the original form, or whether it shall be brought under state regulation as soon as it comes within the limits of the state. It is not to be placed in the same category with grain, flour, dry goods, and the like, which do not contain the elements of danger that liquor does. Powder, dynamite, nitro-glycerine, and arsenic are property, and the subjects of commerce; but all agree that a reasonable regulation of their introduction, use and sale by a state, whether they are in original packages or not, is a proper exercise of the police power. In *Gilman v. Philadelphia,* 3 Wall. 730, this subject was under consideration, and it was held that while a state law requiring an importer to take out a license before he could sell a bale of imported goods, was void, yet that "a state in exercise of its police power may forbid spiritous liquors imported or brought from another state to be sold by retail, or to be sold at all, without license, and it may visit the violation of the prohibition with such punishment as it may deem proper."

Imported intoxicating liquors—sale subject to state law.

If the point contended for, that liquor may be shipped from another state to any point in Kansas and there sold in the

original packages, should be upheld, it would virtually destroy not only the prohibitory laws of Kansas and of some other states, but also the license and local-option laws of all the remaining states in the Union.    The learned attorney-general, in speaking of the result to which this theory would lead, in his argument says that—

"It would seriously impair the efficiency of, if not practically destroy, our prohibitory law.    In the one case, 'original packages,' large and small, might become the ordinary merchandise of every corner grocery in the state.    In the other case, every person who desired to engage in the saloon business could become at once an importer of 'original packages,' from the size of a pint flask to that of the jugs of whisky imported from Nebraska in this case, and thus be able to ply his business without let or hindrance from our prohibitory law."

In the *License Cases*, 5 How. 608, where the New Hampshire case was under consideration, Mr. Justice Catron remarked:

"To hold that the state license law was void as respects spirits coming in from other states as articles of commerce, would open the door to an almost entire evasion, as the spirits might be introduced in the smallest divisible quantities that the retail trade would require, the consequence of which would be that the dealers in New Hampshire would sell only spirits produced in other states, and that produced in New Hampshire would find an unrestrained market in the neighboring states having similar license laws to those of New Hampshire."

Every state in the Union has enacted laws to protect society from the admitted evils of the liquor traffic.    Some have low license, some have high license, some have local option, and others have taken the advanced position of Kansas, to prohibit its manufacture and sale except for certain purposes generally regarded as beneficial.    In many, if not all, of the license states there are prohibitory features in the regulations imposed.    Some of them are that liquor cannot be sold to minors or drunkards, nor sold on Sundays, election days, or at night, nor sold at a place adjoining or near to churches and school-

houses. Then again, the tribunals granting the license are generally invested with the discretion and authority to deny a license to any applicant if they do not regard him as a suitable person to engage in the traffic. So it is seen that all these regulations are more or less prohibitory in their character, and all are to be governed by the same principle when considered in connection with the commercial power of congress. The federal power, within its proper limits, must be regarded as paramount and controlling; but in delegating this power it was never intended that the people should be crippled in the police power of self-protection, which was never surrendered, and which the states only can exercise. The federal power is always to be construed as a measure for the public good, and carries with it the implied exception that the right of self-protection remains with the states—a right which may always be exercised, although it may to some extent affect the exclusive commercial power of the general government. The supreme court of the United States has never held, nor do we think that it ever will hold, that the commercial power supplants and strikes down the police power of the states, as it would if the view contended for should prevail.

It should also be stated that the regulations imposed by Kansas do not conflict with any act of congress upon the subject. As the power exerted by the state in this instance operated on interstate traffic, and as it is a local regulation to protect the health, morals, and safety of the people, is it not valid in any view, in the absence of congressional legislation upon the subject? It is said that, as to all subjects of a national character, and which require uniformity of regulation, the silence of congress is a declaration of its purpose that commerce in that commodity shall be free; but as to subjects which are local in their nature, and can be best provided for by local regulation, the inaction of congress does not preclude the exercise of power by the state, but her laws enacted in good faith would stand until they were displaced by federal legislation. (*Mobile v. Kimball*, 102 U.S. 691, 697.)

In *Cooley v. Board of Wardens*, 12 How. 299, it was held that, while pilot laws were in their nature regulations of commerce, they were valid exercises of power lodged in the states, in the absence of legislation on the subject by congress. The court said that—

"The power to regulate commerce embraces a vast field, containing not only many, but exceedingly various subjects, quite unlike in their nature; some imperatively demanding a single uniform rule, operating equally on the commerce of the United States in every port; and some, like the subject now in question, as imperatively demanding that diversity which alone can meet the local necessities of navigation."

And, in speaking of the pilot law, it was decided that it was local, and not national; and that it was a subject likely to be best provided for by such systems or plans of regulation as the legislative discretion of the several states should deem applicable. In *Case of the State Freight Tax*, 15 Wall. 279, it was said:

"Cases that have sustained state laws alleged to be regulations of commerce among the states, have been such as related to bridges or dams across streams wholly within a state, police or health laws, or subjects of a kindred nature, not strictly commercial regulations. The subjects were such as in *Gilman v. Philadelphia*, it was said, 'can be best regulated by rules and provisions suggested by the varying circumstances of different localities, and limited in their operation to such localities respectively.'"

Now we have seen that the police laws for the control of the liquor traffic, enacted with a view to guard the health, morals and safety of the people, differ widely in the several states, each state deciding for itself the policy to be pursued, and providing what it is deemed will best promote the public welfare; and, as above indicated, it is a subject that "can be best regulated by rules and provisions suggested by the varying circumstances of different localities." In *Morgan v. Louisiana*, 118 U. S. 455, it is decided that a system of quarantine laws established by the statutes of Louisiana was a rightful exercise of the police power; and although some of the rules

of the system amounted to regulations of commerce, they applied to that class which states may establish until congress acts in the matter, by covering the same ground or forbidding state legislation.    Mr. Justice Miller, who pronounced the judgment, in speaking of the fact that congress had enacted no such legislation, remarked that—

"No doubt they believed that the power to do this belonged to the states; or, if it ever occurred to any of its members that congress might do something in that way, they probably believed that what ought to be done could be better and more wisely done by the authorities of the states, who were familiar with the matter."

Is this remark not properly applicable to state legislation concerning the liquor traffic?    May it not properly be said that the omission of congress to provide regulations concerning the traffic was because they "believed that the power to do this belonged to the states," and could be done by them better and more wisely, because they were familiar with the matter?    This view is supported to some extent by the following cases: *Willson v. Blackbird Creek*, 2 Pet. 245; *Gibbons v. Ogden*, 4 Wheat. 1; *Gilman v. Philadelphia*, 3 Wall. 713; *Peik v. Rly. Co.*, 94 U. S. 178; *Munn v. Illinois*, 94 id. 135; *Escanaba Co. v. Chicago*, 107 id. 678; *Transportation Co. v. Parkersburg*, 107 id. 701; *Cardwell v. Bridge Co.*, 113 id. 205; *Hamilton v. Vicksburg*, 119 id. 280; *Huse v. Glover*, 119 id. 546; *Smith v. Alabama*, 124 id. 465.    One of the latest cases which treats upon the subject is *Bowman v. Chicago &c. Rld. Co.*, 125 U. S. 482, where the doctrine previously announced, that the non-action of congress respecting foreign commerce is to be taken as a declaration that the importation of articles into the state shall be unrestricted, is recognized. It is there said: "The power conferred upon congress to regulate commerce among the states is indeed contained in the same clause of the constitution which confers upon it power to regulate commerce with foreign nations;" but in that connection it is also stated that "the same necessity perhaps does not exist equally in reference to commerce among the states."

It seems to be held that a different inference is to be drawn from the non-action of congress in respect to foreign commerce and its non-action in regard to interstate commerce.

"Laws which concern the exterior relations of the United States with other nations and governments are general in their nature, and should proceed exclusively from the legislative authority of the nation; . . . and yet in respect to commerce among the states it may be, for the reason already assigned, that the same inference is not always to be drawn from the absence of congressional legislation as might be in the case of commerce with foreign nations. The question, therefore, may be still considered in each case as it arises, whether the fact that congress has failed in the particular instance to provide by law a regulation of commerce among the states is conclusive of its intention that the subject shall be free from all positive regulation, or that, until it positively interferes, such commerce may be left to be freely dealt with by the respective states."

This case is certainly not an authority that a reasonable regulation of a state, enacted to promote the peace, morals, and health of its people, and which somewhat restricts interstate commerce, should be held void. It would seem that the question, so far as interstate commerce is concerned, is regarded by the court as an open one, to be determined from the circumstances of each case as it arises. Is not a law such as that in question, and for the reason mentioned, within the police power of the state, to be exercised until congress should provide to the contrary? We need not enter into an analysis of the numerous cases decided by the supreme court of the United States upon this subject, nor upon an extended discussion of the principles involved. There is a decision of that court which is directly in point upon the question before us, and must be held as decisive of the case. In *Pierce v. New Hampshire*, 5 How. 504, the defendant was indicted and convicted for unlawfully selling a barrel of gin, which he purchased in Boston, transported to Dover, New Hampshire, and there sold the same in the identical form in which it was carried to that state from Massachusetts. It was urged there, as here, that as the liquor was transported

into New Hampshire from another state, it might be sold in the "original package" or barrel, or the form in which it was transported; but the decision of the court was adverse to this claim, and it was expressly held that liquors so imported from another state were subject to local police regulation, and could not be sold in the original form, except as the law of the state provided. The reasons given by the members of the court were somewhat at variance, but the case distinctly settled the question that the local regulation did not infringe upon the commercial power of the federal government, and that when liquors were brought into the state they were subject at once to its laws regulating their sale, use, and disposition. The case, although much criticised, has never been overruled, and is of itself sufficient to control the decision of the present case.

Much reliance is placed upon what is said by the court in the case of *Bowman v. Rly. Co.*, supra, and it must be conceded that it furnishes considerable ground for the argument made in behalf of the appellant in this case. The question presented there, however, was entirely different from the one before us. The state of Iowa attempted, by an act of its legislature, to exert power over persons and property beyond the limits of that state. It sought to prohibit common carriers from bringing liquors from a point outside of the state to a point within the state, unless they had been provided with written evidence of the right of the consignee to sell the same when it reached the state. It is, therefore, seen that it was a regulation directly affecting interstate commerce, and an effort to give the same effect beyond the territorial limits of the state. It cannot be regarded as an authority upon a question relating to an exercise of the police power of the state over persons and property within its own limits. The writer of the opinion is careful to distinguish it from the License Cases; and to prevent any misconception upon that point he states in the concluding part of the opinion that "it is not necessary now to express any opinion upon

the point, because that question does not arise in the present case."

In the case of *Mobile v. Kimball*, 102 U. S. 691, as well as some other cases, the doctrine of the License Cases was referred to approvingly.

The precise point we are considering was before the supreme court of Iowa in three recent cases, in each of which the License Cases were followed, holding that intoxicating liquors are subject to the police power of the state, and that a regulation of their sale in original packages, or otherwise, when they arrive in the state, does not violate the provision vesting the commercial power in the general government. (*Collins v. Hills*, 41 N. W. Rep. 571; *Grusendorf v. Howat*, 41 id. 573; *Leisey v. Hardin*, 43 id. 188.)

Our conclusion is that the district court did not err in instructing the jury; and hence its judgment will be affirmed.

All the Justices concurring.