PeeIjLE, J.,
delivered the opinion of the court:
The claimants in this action seek to recover $74,000 on account of damages alleged to have been sustained by the overflow and the washing away of the buildings and fencing thereon of about 2,300 acres of land owned by them successively on the west bank of the Mississippi Elver, in Madison County, La., located about 6 miles below the city of Vicksburg, $58,000 of which is claimed by Thomas C., and $16,000 by his wife, Emma.
Prior to 1876 the Mississippi Eiver flowed around a narrow point of land known as' De Soto Point, and in going around this point flowed bj>- the city of Vicksburg in a southwesterly direction. In the spring of 1876 De Soto Point became so narrowed by erosion that the river broke through, leaving De Soto Point as an island, and taking its course immediately to the south. The result was that the city of Vicksburg was *499 left some miles away from the main channel of the river, and the old channel continually filled up, thereby making the approach from the river to the docks in front of the city very difficult. ,
In consequence of that cut-off the United States, by their • officers and agents, between 1878 and 1884, constructed about 10,700 feet of revetment along the banks of the river at Delta Point, on the Louisiana side, for the purpose of preventing further erosion. The revetment consisted of willow mattresses weighted down by stones which were placed on the banks of the river below high-water mark, though not on or in contact with the lands of the claimants. The object of the construction was to prevent the navigable channel of the river from receding farther from the city of Vicksburg. The revetment was repaired in 1886 and in 1889, and still more extensivety in 1894, all of which work was paid for out of the appropriations made by Congress from time to time. (20 Stat. L., 363, 366; 21 .Stat. L., 181, 470; 26 Stat. L., 450, 1116.)
The effect of the revetment, as intended, was to preserve the banks of the river at Delta Point in the same position and condition they were in at the time the revetment was built.
In making the improvement the defendants did not recognize any right of property in the claimants in or to the right alleged to be affected; nor did thej'- assume to take private property in the construction, but proceeded in the exercise of their right to improve the navigation of the river.
After the cut-off at De Soto Point in 1876, and the construction of the revetment thereafter, the current of the river was directed.against and upon the. lands of the claimants, situate about 6 miles below, and thereby overflowed and washed away the buildings and fences thereon to the damage of each of said claimants in a sum in excess of $3,000.
The claimants’ contention is that, by the construction of the revetment, the channel of the river was diverted from its natural course and thereby made to overflow their lands, de-' priving them of their use; which overflow, they contend, was the taking of private property for public use, for which just compensation should be made within the meaning of the Fifth Amendment to the Constitution, as in effect construed by *500 the Supreme Court in the case of Pumpelly v. Green Bay Company. (13 Wall., 166.)
In that case Pumpelly brought trespass on the case against the Green Bay,Company for overflowing 640 acres of his land by means of a dam erected across Fox Elver, the northern outlet of Lake Winnebago, by reason of which the waters of the lake were raised so high as to forcibly and with violence overflow said land, tearing up his trees and grass by the roots and washing them, with his hay, away, choking up his drains and filling up his ditches, and otherwise injuring his lands by leaving deposits of sand, etc.
On that state of facts, the court, in construing the provision of the constitution of Wisconsin, which provides that “the property of no person shall be taken for public use without just compensation therefor,” said:
‘ ‘ But there are numerous authorities to sustain the doctrine that a serious interruption to the common and necessary use of property may be, in the language of Mr. Angelí, in his work on water courses, equivalent to the taking of it, and that under the constitutional provisions it is not necessary that the land should be absolutely taken. And perhaps no State court has given more frequent utterance to the doctrine that overflowing land by backing water on it from dams built below is within the constitutional provision than that of Wisconsin. In numerous cases of this kind, under the mill and milldam act of that State, this question has arisen, and the right of the mill owner to flow back the water has been repeatedly placed on the ground that it was a taking of private property for public use. It is true that the court has often expressed its doubt whether the use under that act was a public one, within the meaning of the Constitution, but it has never been doubted in any of those cases that it was such a talcing as required compensation under the Constitution. As it is the constitution of the State that we are called on to construe, these decisions of her Supreme Court, that overflowing land by means of a dam across a stream is taking private property within the meaning of that instrument, are of special weight if not conclusive on us. And in several of these cases the dams were across navigable streams. * * *
“We are not unaware of the numerous cases in the State courts in which the doctrine has.been successfully invoked that for a consequential injury to the property of the individual, arising from the prosecution of improvements of roads, streets, rivers, and other highways for the public, good, there *501 is no redress; and we do not deny that the principiéis a sound one in its proper application to many injuries to property so originating. And when in the exercise of our duties here we shall be called upon to construe other State constitutions, we shall not be unmindful of the weight due to' the decisions of the courts of those States. But we are of opinion that the decisions referred to have gone to the uttermost limit of sound judicial construction in favor of this principle, and in some cases, beyond it, and that it remains true that where real estate is actually invaded by superinduced additions of water, earth, sand, or other material, or by having any artificial structure placed on it, so as to effectually destroy or impair its usefulness, it is a taking within the meaning of the Constitution, and that this proposition is not in conflict with the weight of judicial authority in this country and. certainly not with sound principle. Beyond this we do not go, and this case calls us to go no farther.”
In that case the overflow was caused by the dam constructed at the outlet of the lake, which raised the water above the ordinary level.
The dam was constructed pursuant to an act of the legisla- ' ture of Wisconsin. The lands were not absolutely taken or converted to the uses of the public, but the owner, by reason of the overflow, was deprived of their possession and use, and that deprivation of private property was held to be a taking for public use for which compensation should be made within the meaning and intent of the constitution of Wisconsin. . To the same effect also is the case of Eaton v. Boston, Concord and, Montreal Railroad, Company (51 N. H., 501).
Later, in the case of Transportation Company v. Chicago (99 U. S. R., 635, 642) the court, referring to the authorities collected at page 512, Cooley’s Constitutional Limitations, says that in those two cases — that is, the PumpelVy Case and the Eaton Case (supra) — is to be found, perhaps, “the extremest qualification of the doctrine. ”
The Government is only liable for the acts of its agents within the reasonable scope of their authority, and if they exceed that, their acts are wrongful, for which the Government is not liable. (Langford v. United States, 101 U. S., 341; Hill v. United States, 119 U. S. R., 592.)
In the present case, however, the officers and agents of the Government were authorized by sundry acts of Congress to *502 improve the Mississippi River in the interest of navigation, and the construction of the revetment for the protection of the harbor of Vicksburg appears to have been within the limits of their authority. (20 Stat. L., 363, 366; 21 Stat. L., 181, 470; 26 Stat. L., 450, 1116.)
The power to control and improve the navigable rivers in the United States is derived from article 1, section 8, of the Constitution, which grants to Congress the power “to regulate commerce with foreign nations and among the several States,” and is complete in itself, and maj'' be exercised to its utmost extent consistent with the limitations prescribed in the Constitution. (Gibbons v. Ogden, 9 Wheat., 1, 196.) The power to regulate commerce with foreign nations and among the several States includes the power to control for that purpose “all the navigable waters of the United States whióh are accessible from a State other than those in which they lie.” (Gilman v. Philadelphia, 3 Wall., 713, 724; Genesee Chief v. Fitzhugh, 12 Howard, 443; Illinois Central Pailroad Company v. Illinois, 146 U. S. R., 387.)
That the Government had the undoubted power and authority to improve the river by the construction of the revetment, as it did, is conceded by the claimants; but their contention is that, by reason of the construction, the channel of the river was diverted from its natural course, thereby overflowing-their lands and depriving them of their use as the proximate result thereof.
Therefore, in the construction of the revetment for the improvement of navigation in the interest of commerce the Government was in the rightful control of the river and to that extent and for that purpose was the owner. Or, as was said in the case of Gilman v. Philadelphia (supra), “for this purpose thejr are the public property of the nation and subject to all the requisite legislation by Congress.” The appropriations made from time to time for the improvement of the river was an assertion of a right belonging to the Government.
Where the Government takes property for public use, asserting no title thereto, but, on the other hand, conceding the same to be private property, an implied contract will arise to make just compensation therefor, as was held in the case of the Great Falls Manufacturing Company v. United States *503 (112 U. S. R., 645). But that case is not controlling-in the present case..
As to the questions of fact going to the cause of the deflection of the river and the effect of the revetment on the stream, we have found in finding vii that the cause of the deflection of the river upon the claimants’ land was the cutoff which shortened the distance of the stream 6 miles, and thereby increased the velocity of the current and forced the current to turn when it struck the Mississippi bank at an abrupt angle. The revetment did not change the course of the river as it then existed, but operated to keep the course of the river at that point as it then was. If the revetment had not been built, the cut-off would have continued to widen toward the Louisiana bank, and the channel would have continued to move in the same direction. With the widening of the cut-off and the shifting of the channel, the angle at the turn below the cut-off would have gradually become less abrupt, and the deflection of the stream upon the claimants’ land would have grown less, and the consequent injury to the claimants’ land would have been decreased. To what extent the injury would have been decreased is conjectural. The injury done to the claimants’ land was an effect of natural causes; the injury caused by the Government was by interrupting the further progress of natural causes, i. e., the further change in the course of the river, and the extent of such injuiy is conjectural.
In the case of Gibson v. United States (166 U. S. R., 269, 271), affirming the judgment of this court (29 C. Cls. R., 18), where numerous authorities are collated and commented upon, the claimant, as owner of land bordering on the Ohio River, had riparian rights, of which she was deprived by reason of the construction, by authority of an act of Congress, of a dike which diverted the water from the claimant’s frontage, thereby causing her great damage, yet the court held that “although the title to the shore or submerged soil is in the various States and individual owners under them, it is always subject to servitude in respect of navigation created in favor of the Federal Government by the Constitution.” It was also held, in substance, that riparian ownership was subject to the dominant right of the Government to improve naviga *504 tion, and that the damage resulting from the construction of the dike for the public good was not the result of a taking- of the claimant’s property, but that the same was “merely incidental to the exercise of a servitude to which her property had always been subject.”
That case, however, differs from the case of Pumpelly v. Green Bay Company (supra) in this, that in the latter case there was a physical invasion of the claimant’s property by flooding, while in the former-there was no invasion.
In the case of South Carolina v. Georgia (93 U. S. R., 4, 11) it was said:
“It is not, however, to be conceded that Congress has no power to order obstructions to be placed in the navigable waters of the United States, either to assist navigation or to change its direction by forcing it into one channel of a river rather than the other. It may build light-houses in the bed of the stream. It may construct jetties. It may require all navigators tó pass along a prescribed channel, and may close any other channel to their passage. If, as we have said, the United States have succeeded to the power and rights of the several States, so far as control over interstate and foreign commerce is concerned, this is not to be doubted.”
Thus reviewing the authorities and the facts of this case, was the overflow of the claimants’ lands and the washing away of the improvements thereon the result of the exercise by the Government of its right of eminent domain, and if so, upon what theory ?
The claimants were deprived of their lands bjr natural causes, and if any injury was added thereto by the acts of the Government it was consequential and the extent thereof is conjectural; nor was anything said between the parties looking to an appropriation of the land.
The Government not only has the unquestioned power to improve the navigable rivers of the United States, but in respect to those rivers “accessible from a State other than those in which they lie” the improvement rests with the Government; and where injury results to lands from natural causes, affecting commerce, shall the Government delay improvement until from natural causes such injury has been righted?
In the McIntire Case (25 C. Cls. R., 200) the United States *505 quarried stone near a coal mine in sucb manner that the mine was flooded, and the claimant contended that it was a taking of his property under the right of eminent domain within the meaning of the Pumpelly and Great Falls cases (supra); but the court said:
“In the Great Falls case, upon which plaintiff particularly. relies, there was an actual appropriation of the property for the purpose of constructing an aqueduct; it was taken avowedly as private property, to which the Government asserted no title, and was used for the public benefit. The making of the improvements necessarity involved the taking of this property, and when taken it was applied to a public use. In the case at bar appear none of these elements. ' There was no action by the Government officers looking to a talcing of this property; there was no communication of any kind between plaintiff and defendants except a statement made by a subordinate that the Government would make good any injury sustained by plaintiff. It certainly never was intended' to appropriate the mine eimn for temporary purposes, and the flooding of itself was of no benefit to the Government.” (See also the Johnson's Case, 31 C. Cls. R., 262.)
We think it may now be regarded as settled that no implied contract can arise where the Government takes property claiming title and right thereto, and in the Gibson Case in this court (29 C. Cls. R., 25), in speaking of that phase of the question, the court said:
“ The fact that the Government denies the title to the party and bases its action upon a right of its own repels the presumption upon which an implied contract is founded. There can be no contract unless the parties, either by expression or implication, agree; and where the United States deny the title of plaintiff in a taking, the law will not imply, as against the claim of the Government, an agreement to pay. Contracts are made by the agreements and implications arising from acts of parties, and not from their denials and differences.”
Later, in the Friend Case (30 C. Cls. R., 94), where the Government had changed a channel of the James River, resulting in the destruction of an adjacent landing by lessen- . ing the depth of water in front of it, the court, among other things, said:
“ Whatever may be said of the liability of the defendants,, they were, as they understood it, not in the exercise of the power of eminent domain in the improvement of the river. *506 It was in pursuance of the general policy of river and harbor improvements as recognized by acts of Congress for many years. ”
Such was the situation in the present case. The Government, by the exercise of its general policy of improving the navigation of the river in the interest of commerce and for the protection of the harbor at Vicksburg, constructed, by authority of appropriations of money made by Congress therefor, the revetment; not to raise or lower the water or to divert the channel of the river, but merely to hold the channel where from natural causes it had been placed.
The taking of private property under the right of eminent domain, an act of sovereignty sanctioned by the Constitution, can not be exercised by the officers of the Government so as to fix contractural relations without authority looking to the appropriation of such property as the proximate result of their lawful acts; or by the public use and occupation of private propertjr with the knowledge thereof and acquiescence therein by the proper officers of the Government. That is to sajr, to entitle the claimants to maintain an action in this court for the overflow of their lands, it must be made to appear that their right is founded upon a contract, express or implied.
Hence we must hold that though the injury to the claimants’ lands might have been diminished in course of time by further erosion and the consequent shifting of the channel had the revetment not been built, still the fact remains that the injury done was the effect of natural causes, from which no implied contract to pay therefor can arise.
For the reasons we have given, the claimants’ petitions, and each of them, must be dismissed, which is ordered accordingly.