Peelle, Ch. J.,
delivered the opinion of the court:
The defendants demur generally, “that the petition does not allege facts sufficient to constitute a cause of action,” and specifically that the facts alleged in said petition are insufficient “ to constitute a cause of action as to any one of the items therein contained.”
The material averments of the petition are that the claimants are the owners of 80 acres of land in Tensas Parish, La., near Hardtimes Landing, on the Mississippi River, about 45 miles below Vicksburg, Miss., bounded on the west by the Lake St. Joseph, which land was before the injuries complained of in a high state of cultivation, yielding large crops of cotton, corn, hay, and other products, and was of the value of $8,000.
That pursuant to the acts of Congress creating the Mississippi River Commission and subsequent acts for the improvement of the Mississippi River, the officers and agents of the United States entered upon said lands and proceeded to locate and construct thereon a public levee for the pur *23 pose of so confining the flood waters of said river as to scour and deepen the channel, and thereafter, without the consent of the owners and without making compensation therefor, entered upon and took possession of said land and ousted the claimants therefrom, tore down the buildings, and destroyed the crops growing and grown thereon to their damage in the sum of $13,000.
The question broadly stated is, Has the Mississippi Eiver Commission created by Congress the power jbo take on behalf of the United States, without making compensation therefor under the fifth amendment of the Constitution of the United States, lands adjacent- to or bordering on the navigable waters of the Mississippi Eiver in Louisiana and construct thereon a public levee for the purpose of improving the navigation and commerce of said river?
The defendants’ contention is that the claimants’ riparian right to the enjoyment of said lands under the constitution and laws of Louisiana was “ subject to the right of the public to reserve space enough for levees, public roads, and the; like,” and that “ over this space the front proprietor never acquires complete dominion” (Civil Code of La., art. 661, now 665; Remy v. Second Municipality, 11 La. Ann., 161, and Ruch v. City of New Orleans, 43 La. Ann., 275, 280) ; and that inasmuch as the space so reserved, or the servitude'to which said lands were subject, was by article 215 of the constitution of Louisiana transferred to the United States, therefore the United States may take such lands or space and construct thereon public levees for improving the navigation and commerce of said river without making compensation therefor.
The claimants contend that the servitude to which said lands were subject in favor of the State without compensation was in the construction of levees for the reclamation of overflowed lands and to protect private property from overflow ; and that inasmuch as the acts of Congress prohibit the Mississippi Eiver Commission from, constructing public levees except for the improvement of the navigation and commerce of said river (acts March 3,1881, 21 Stat. L., 468, 474, January 19, 1884, 23 ib., 1; July 5, 1884, 23 ib., 133, 146; *24 August 5,1886,24 ib., 310, 329; July 31,1888, 25 ib., 400,421; March 3,1891, 26 ib., 1116; June 3,1896, 29 ib., 202, 230; and March 2, 1907, 34 ib., 1073, 1103), the provision of the state constitution referred to has no application.
That a State can not by its organic law or otherwise confer upon the United States the right to take private property for public purposes without compensation in violation of the fifth amendment of the Constitution requires no argument. But when the right of a State in lands is paramount to that of riparian owners, a different question is presented, as the State is then dealing with property subject to such rule for the public good as the legislature of such State may prescribe. This right, though originally in the State under the Louisiana Purchase, was embodied in article 290 of the constitution of Louisiana, in conformity with which the legislature enacted article 661, now 665, Code of Louisiana, as follows: “ Servitudes imposed for the public or common utility relate to the space which is to be left for the public use by the adjacent proprietors on the shores of navigable rivers, and for the making and repairing of levees, roads, and other public or common works.”
In the case of Sinnot and others v. Davenport and others (22 How., 227, 243), the court, in speaking of the power of Congress to regulate commerce and navigation, said: “ The whole commercial marine of the country is placed by the Constitution under the regulations of Congress, and all laws passed by that body in the regulation of navigation and trade, whether foreign or coastwise, is therefore but the exercise of an undisputed power.” See also the cases of Moran v. New Orleans (112 U. S., 69, 73) and Leloup v. Port of Mobile, 127 U. S., 640, 648; Adams Express Co. v. Ohio, 165 U. S., 194.)
Those decisions, and many others which might be cited show the paramount authority of Congress under the Constitution to regulate commerce among the several States; and in the case of Gilman v. Philadelphia (3 Wall., 713) the court held that the power of Congress to regulate commerce includes the control for that purpose, and to the extent necessary, of all the navigable waters of the United States which *25 are accessible to another State from that in which they lie. To the same effect also are the cases of United States v Coombs (12 Pet., 72); Escanaba, etc., v. Chicago (107 U. S., 678); United States v. Gibson (166 U. S., 269, 271); United States v. Rio Grande Dam and Irrigation Co. (174 U. S., 690), cited in Kean v. Calumet Canal and Improvement Co. (190 U. S., 484), and “ if the power of the State and that of the Federal Government come into conflict, the latter must control and the former yield. This necessarily follows from' the position given by the Constitution to legislation in pursuance of it, as the supreme law of the land.” (Cummings v. Chicago, 188 U. S., 410, 428.)
While all private property is held subject to the necessities of Government under the right of eminent domain and antedates the Constitution, still where the Government under proper authority appropriates such property without claim of right it does so under an implied contract to pay the value' thereof to the owner.
Such has been the ruling in a long line of cases which were reviewed in the case of United States v. Lynah (188 U. S., 445, 464). And in response to the contention that the Government had the right to appropriate the property, the court, in the Lynah case, said:
“ This may be conceded, but there is a vast difference between a proprietary and a governmental right. When the Government owns property, or claims to own it, it deals with it as owner and by virtue of its ownership, and if an officer of the Government takes possession of property under the claim that it belongs to the Government (when in fact it does not) that may well be considered a tortious act on his part, for there can be no implication of an intent on the part of the Government to pay for that which it claims to own.”
In the case of Bedford v. United States (192 U. S., 217, 225) affirming this court (36 C. Cls., 474), the court drew a distinction between the flooding of lands as a result of revetments to prevent erosion of the banks from natural causes; and overflows from the construction of works in the bed of a river which obstructed the natural flow, saying:
“ In the case at bar the damage was strictly consequential. It was the result of the action of the river through a course *26 of years. The case at bar, therefore, is distinguishable from the Lynah ease in the cause and manner of the injury. In the Lynah case the works were constructed in the bed of the river, obstructed the natural flow of its waters, and were held to have caused, as a direct, consequence, the overflow of Lynah’s plantation. In the case at bar the works were constructed along the banks of the river, and their effect was to resist erosion of the banks by the waters of the river. There was no other interference with natural conditions. Therefore, the damage to appellants’ land, if it can be assigned to the works at all, was but an incidental consequence of them.”
In the case of St. Anthony Falls Water Power Co. v. St. Paul Water Commissioners (168 U. S., 349, 358), respecting the rule applicable to the property rights of riparian owners, the court said :
“ In regard to the first proposition, we are of ojoinion that the joroperty rights of the plaintiffs in error, as riparian owners, are to be measured by the rules and decisions of the state courts of Minnesota. This principle, we think, has been announced and adhered to by this court from its very early days, and no distinction has been made between the rights of the original States and those which were subsequently admitted to the Union under the provisions of the Federal Constitution. The provisions of the act of Congress, already cited (act of Feb. 26, 1857, chap. 60, sec. 2, 11 Stat., 166), making the Mississippi Eiver a common highway for the inhabitants of the State and all other citizens of the United States, do not impair the title and jurisdiction of the State over the navigable waters within her boundaries more than rights of that nature are limited with regard to the original States. This has been uniformly held, and is so stated in many of the cases hereinafter cited where similar language has been used in the acts admitting States into the Union.”
This brings us to the question, What were the rights of the State of Louisiana in and to the lands bordering on the Mississippi Eiver within said State prior to the adoption of article 215 of the constitution of said State ?
In referring to the ground upon which the legislative and judicial authorities base their action in refusing to recognize that owners of lands abutting on the Mississippi Eiver are entitled, when a public levee is constructed upon their lands, to invoke the application of that provision of the state constitution which provides that “ private property shall not be *27 taken nor damaged for public use without adequate compensation first paid,” the Supreme Court in the case of Eldridge v. Trezevant (160 U. S., 452, 463) said: “That ground is found in the doctrine existing in the Territory of Louisiana before its purchase by the United States and continuing to this time, that lands abutting on the rivers and bayous are subject to a servitude in favor of the public, whereby such portions thereof as are necessary for the purpose of making and repairing public levees may be taken, in pursuance of law, without compensation.” And though, in the case of Bass v. The State of Louisiana (34 La. Ann., 494), the right to recover damages inflicted upon property in the construction of a levee was denied on the ground that the work was done in the exercise of the police power of the State, the court further said (p. 465): “But we do not understand that the Supreme Court of the State intended thereby to repudiate the doctrine of a servitude, explicitly declared in the code, and recognized, through a long period, by many decisions. If, to approve the judgment in that case, it were necessary to hold that the State and its agents can take private property, wherever situated, and apply it to any public purpose, and escape from the duty of compensation by terming such action an exercise of the police power, it is difficult to see how such a conclusion could be reached by the courts of a State in whose constitution is to be found a provision that private property shall not be taken for public use without just and adequate compensation first made.”
Further, in this same connection, the court said: “This, we think, clearly appears by the later case of Ruch v. New Orleans (43 La. Ann., 275), where the Supreme Court reviewed the law and the cases, and again put the immunity of the city from liability for damages occasioned to the front of the plaintiff’s property by a public work upon the long-established doctrine of a servitude, and declared that ‘the riparian owner enjoys his property sub modo, i. e., subject to the right of the public to reserve space enough for levees, public works, and the like; that over this space the front proprietor never acquires complete dominion. It never passes free of this reservation to a purchaser.’ ” See also the case of Peart v. Meeker, etc. (45 La. Ann., 421).
*28 Thus a distinction is made between the taking of lands for levee purposes in the exercise of the police power of the State — which power is not transferable — and lands taken under the claim of superior right by reason of the servitude to which such lands are subject; and in construing the provisions of said article 665 of the code the court, in the case of Dubose v. Levee Commissioners (11 La. Ann., 165), said: “The law concerning the expropriation of private property for public use does not apply to such lands upon the banks of navigable rivers as may be found necessary for levee purposes. The quantity of land to be taken for such purposes presents a question, of policy or administration to be decided by the local authorities, whose decisions should not be revised by this tribunal, except for the most cogent reasons, and where there has been manifest oppression or injustice.”
Therefore, following the decisions to which we have referred, we must hold that in Louisiana the riparian owner or front proprietor of lands on the shores of navigable waters so subject to such servitude never acquires complete dominion over the same, and hence the space or quantity of land taken for such purposes — to be decided by the local authorities — does not come within the provision of the state constitution providing that private property shall not be taken or damaged without adequate and just compensation, and that the decision in respect thereto is not subject to revision unless the same results in manifest oppression or injustice. But, as was said in the case of Zenor v. Parish of Concordia (7 La. Ann., 150), “ the policy of the country and the laws of the land, made for the general safety, can not yield to cases of individual hardship.”
Having therefore determined the rights of the State of' Louisiana in the erection and maintenance of levees on land bordering on the Mississippi River and bayous, let us now inquire as to the power of the United States, through the Mississippi River Commission, to erect, repair, and maintain, without making compensation for the lands so taken, levees in said State for the improvement of navigation and commerce.
*29 By articles 213 and 214 of the constitution of Louisiana of July 23, 1879, provision is made for maintaining in the State a levy system by taxation on all property subject to taxation. The general assembly is given authority to divide the State into levy districts and to provide for the appointment or election of levy commissioners therein to have supervision of the erection, repair, and maintenance of levees in their respective districts; and then by article 215 it is provided :
“ The provisions of the above two articles shall cease to have effect whenever the Federal Government shall assume permanent control and provide ways and means for the maintenance of levees in this State. The Federal Government is authorized to make such geological, topographical, hydrographical, and hydrometrical surveys and investigations within the State as may be necessary to carry into •effect the act of Congress to provide for the appointment of a Mississippi River Commission for the improvement of said river, from the Head of the Passes near its mouth to the headwaters, and to construct and protect such public works and improvements as may be ordered by Congress under the provisions of said act.”
The above article is reproduced in identical words in the constitution of May 12, 1898, as article 240.
The court takes notice as a matter of history that the Mississippi River frequently overflowed its banks in Louisiana and elsewhere and inundated lands for miles on either side of its main channel, and that to construct and maintain levees was a heavy tax upon the State.
The Mississippi River Commission was created by act of June 28, 1879 (21 Stat. L., 37), and by subsequent acts has been authorized to construct and maintain levees and to deepen the channel in the interest of navigation and commerce. It was perhaps because of this act looking to the permanent improvement of said river by the United States and the consequent protection thereby secured to the property of her citizens that the State of Louisiana in July following-adopted article 215 above set out. By this organic provision Louisiana, so far as necessary, transfers to the Federal Gov *30 ernment permanent control of the construction and maintenance of such levees in said State. Thereby the Federal Government, in addition to the power it already had, is given authority to make such surveys and investigations within the State as may be necessary to carry into effect the act providing for the appointment of the Mississippi River Commission and subsequent acts authorizing said commission to improve said river by the construction of such levees and public works as may be provided for by Congress. Hence for the purpose of locating and constructing levees by the Mississippi River Commission, for the improvement thereof, the constitution of Louisiana conferred upon the United States powers the State had in respect to such servitude that were not theretofore possessed by the United States. This the State endeavored to do; and the United States, as shown by the various acts of Congress herein referred to, thereafter assumed permanent control of the construction and maintenance of levees for the improvement of the navigation of said river.
And this for the reason that without the power so conferred such lands, as between the United States and such riparian owner, could have been taken only under the power of eminent domain, but as between the State of Louisiana and such riparian owner the State, by reason of the servitude to which such lands were subject, had the superior right; and having the superior light, the State could, by and through its constitution, confer such right upon the United States.
This view is in harmony with the ruling in the case of Shively v. Bowlby (152 U. S., 1, 58) respecting the title to lands below high-water mark in the Columbia River where parties were claiming under grants from the United States and the State of Oregon, respectively, and in relation to which the court said: “ Grants by Congress of portions of the public lands within a Territory to settlers thereon, though bordering on or bounded by navigable waters, convey, of their own force, no title or right below high-water mark, and do not impair the title and dominion of the future State when created, but leave the question of the use of the shores by the owners of uplands to the sovereign control of *31 each State, subject only to the rights vested by the Constitution of the United States.” The State, acting in its sovereign capacity, endeavored to, and did by its constitution, confer upon the United States powers it possessed, to-take, without compensation therefor, lands so subject to servitude to thereby enable the United States to assume permanent control of the construction and maintenance of levees in said State for the improvement of navigation. That is to say, “ to construct and protect such public works, and improvements as may be ordered by Congress ” under the provisions of the act providing for the appointment of' the Mississippi River Commission for the improvement of said river; so that it was within the power of the State to-confer upon the United States the authority it possessed to construct on lands subject to such servitude levees and other public works, though such construction is declared by Congress to be for the improvement of navigation and commerce.
The purpose for which such levees are declared to be constructed can not alter the fact of resultant benefits to the citizens of the State, not only in reclaiming overflowed lands- and protecting private property from overflow, but in lessening taxation. •
It would be a too narrow construction to say that because the United States construct levees for the improvement of navigation and commerce, therefore whatever land they take-for that purpose is exempt from such servitude and becomes-private property. Whatever power the State conferred by its constitution carried with it the rights, benefits, and exemptions the State enjoyed in respect to such servitude, and such was the purpose of the provision as held by the attorney-general of Louisiana, wherein, under date of December-29, 1892, in a communication addressed to Maj. H. B. Richardson, chief state engineers, among other things, he said: “Article 215 of the constitution of the State transfers to and confers upon the Federal Government all its powers with reference to- such public, works and im|>rovements as-it may construct under the orders and directions of the Mississippi River Commission; ” and further therein he said: “ In the carrying out of the law the United States, engineers are invested with the power and duty to locate *32 levees to be built by the United States Government, and they have the exclusive power to locate them, in the same manner and to the same extent that the state engineers have in locating levees to be built by the State or levee districts.”
To the same effect also is the decision of the Twenty-third District Court of Louisiana in the case of John M. Gillespie v. Israel R. Bobbitt, decided in 1900, being an action to recover •damages against a contractor with the United States for property destroyed in the necessary construction of a levee on the claimant’s land; and though the authority of the State to construct levees is stated by the court to be under the police power instead of the doctrine of servitude declared in the code and recognized by judicial decisions in that State, still •the court said:
“It is obvious that the power of appropriating the property of the citizens for public use by the Government for the building of levees may be exercised by agents or servants employed, for. that purpose, as defendant was in this case. It would, indeed, be a reduotio■ ad absurdum to confer upon the Government the power to take' and damage property without compensation by building a levee on it and to exact compensation from the agent or servant of the Government for property temporarily occupied and crops necessarily destroyed during the progress of the work.”
“ In the views expressed above I do not wish to be understood as holding that in the exercise of its power to build levees the Government or its agents can, without compensation, appropriate or destroy unnecessarily the property of the citizen. That power should be used prudently and with a just regard to the rights of the owner of the estate by which the servitude is owing. Where manifest disregard of those rights, oppression, or injustice are shown, a court of justice would not hesitate to award adequate compensation.”
If the lands .on the shores of the navigable waters of said State are subject to such servitude, then it follows that they may be taken and used for the construction of levees without compensation therefor. Otherwise they would have to be held private property subject to public use under the power of eminent domain.
It is not shown in the present case that any injury resulted to the claimants other than the taking of their property for the construction of the levee deemed necessary by the Mississippi River Commission.
*33 As the lands, or the part thereof abutting on the navigable waters of the Mississippi River, over and through which the Mississippi River Commission located and constructed the levee, was subject to a servitude in favor of the public, both for “ the making and repairing of levees,” such use was not a taking of private ptoperty under the right of eminent domain, but was the exercise of power lodged in the Government over the land to which the riparian proprietor never acquired complete dominion, and hence any private injury resulting from the exercise of such legal right was damnum óbsque injuria; and, the lands abutting, on said navigable water being subject to such servitude, the averments of the petition that the claimants are the owners thereof and that there is no law subjecting the same to such servitude are conclusions of law to be determined by the court and therefore are not facts admitted by the demurrer.
The wisdom of the levee, as well as the quantity of land to be taken therefor, were questions to be determined by the Mississippi River Commission in the exercise of the power lodged in its members, and therefore unless their action was •outside their authority, or manifest oppression or injustice is shown to have resulted from their action, the court will not intervene to revise their decision.
The legal title to that portion of the land not actually taken and used or that was not necessary in the construction of the levee, as well as the legal possession thereof, remain as they wei;e prior thereto. That is to say, the claimants have not by the averments of their petition shown that the actual taking of so much of the land as was necessary to construct the levee operated as a taking of the residue. Nor have they by the averments of their petition shown why the lands so taken for the construction of said levee were excepted from such servitude in favor of the public.
In other words, the averments of the petition do not disclose on what particular part or portion of said land the levee was constructed or how the construction thereof operated as a taking of the whole tract. The averments are general that “the officers and agents of the United States in pursuance of the act of Congress creating the Mississippi *34 River Commission, and subsequent acts for the improvement of the navigation of the Mississippi River, entered upon said lands of petitioners * * * and ousted them therefrom and destroyed the crops growing and grown thereon” to-their damage in the sum of $13,000, but it is not shown whether the crops alleged to have been destroyed were on that portion of the land actually taken and used for said levee. And as the location and construction of the levee was, as averred, pursuant to various acts of Congress, the commission acted within their authority, and having acted within their authority, the presumption is that whatever lands they took for the construction of the levee were necessary therefor, and if necessary, then whatever personal damages resulted therefrom were damnum obsgue injuria, and hence no implied contract arises to pay therefor.
We are not unmindful of the importance of this case and of the hardships that may result to adjacent owners of land on the shores of the Mississippi River if the conclusion of the court should finally be upheld, but from the decisions to which we have referred and upon which we rely — though with some doubt — we are constrained to give effect to the constitution of the State seeking to confer upon the United States the rights, benefits, and exemptions theretofore enjoyed by the State in the construction of levees on lands, subject to such servitude for the common good. If, in the construction of levees on lands so subject to servitude in favor of the public, the United States are to be charged with the taking thereof as private property for public use under the right of eminent domain, then the provision of the constitution referred to is a nullity, as that power is always present in the United States; and as the State can not transfer its inherent or police power, it must have intended to confer upon the United States its su'perior right to the use of such lands for levee purposes on the ground of servitude, to which they were subject. By the act of March 3, 1881, supra, being the first act passed after the adoption of the constitutional provision referred to, the plans of the Mississippi River Commission for the permanent improvement of said rivers (House Ex. Doc., 2d sess. 46th Cong., vol. 24, pp. 2, 20) were adopted, and therein *35 the commission was authorized to extend the work “ to the tributaries of said river to the extent, and no further, that may be necessary in the judgment of said commission to the perfection of the general and permanent improvement of said Mississippi River.” In concluding their report the commission suggested that if Congress authorized any extensive works of improvement provision should be made for the appropriation of needed land and material when the same could not be obtained upon equitable terms by purchase from the owners; but Congress, while directing that the river be improved in accordance with the plans of the commission, made no appropriation or provision for appropriating lands therefor. The subsequent acts of "Congress hereinbefore referred to look to the same end. And if Congress have not in express terms assumed permanent control for the improvement of said river in accordance with the plans of the commission, there have been, since the adoption of said constitutional provision, appropriated and expended in the improvement of said river from the Head of the Passes to the mouth of the Ohio River alone more than fifty millions of dollars..
Therefore, the adoption by Congress of the plans of the commission under which the State constitution provided the work should be done as ordered by Congress, coupled with the actual work done and money expended therefor, would seem to be sufficient to entitle the United States to the benefits of said constitutional provision, notwithstanding the statement of the court in the case of Munson et al. v. Board of Commissioners (43 La. Ann., 15, 32), in 1891 to the effect that the United States had not yet assumed permanent control of the levees in said State or provided ways and means for maintaining the same.
In view of the vast amount of work done and money expended in constructing and maintaining levees in said State, in strict compliance with the plans of the Mississippi River Commission, the courts of the United States should have a voice in construing the provision of the Constitution conferring upon the United States rights and benefits theretofore enjoyed by the State.
*36 True, the appropriations made therefor are not to be diverted to the protection of private interests or the reclamation of overflowed lands, as those objects are clearly not within the constitutional grant of power to improve navigation, as the State and her citizens well knew; and we must assume that they also knew that the improvement of said river in the interest of commerce would of necessity incidentally if not directly protect private interests, and doubtless for this reason the constitutional provision was adopted. The people of the State are evidently satisfied with the provision, as nearly twenty years after its adoption the article in identical words was reproduced in the constitution of May 12, 1898.
For the reasons we have given the demurrer to the petition must be sustained, which is accordingly done, and the claimants are given sixty days within which to amend their petition.
TIowkt, J., was not present when this case was tried and took no part in the decision of the court.